Taylor *v.* The State.

ANDREW TAYLOR *v.* THE STATE.

1. CRIMINAL LAW. *Copy of indictment to prisoner.* If the defendant in a capital case, after the court at his instance had made an order directing a copy of the indictment to be furnished him; go to trial on the third day thereafter without objection, one of the intervening days being Sunday, he will be presumed to have waived his statutory right to have the indictment two entire days before trial.

2. SAME. *Continuance.* It is not error to refuse a continuance in such a case upon the affidavit of the defendant that "he is informed by his counsel" that a person named, living thirty-five miles from the place of trial, and another person named then in Oregon, knows facts material to his defense, by whom he expects to prove that he is not responsible for the crime charged in the indictment, the record showing that there was sufficient time to have had the testimony of the first witness at the trial, and that the statement as to the other witness was false and fabricated for delay.

3. SAME. *New trial.* It is not error in the trial judge in such case to refuse a new trial, upon the affidavit of the defendant's attorney alone that "he is informed" that an absent witness will depose to a certain conversation between defendant and an associate in guilt on the day of the murder, the affiant not expressing any belief in the information, and the affidavit not being supported by the affidavit of the defendant himself to the fact of such conversation, and of the person who received the information direct from the absent witness.

4. SAME. *Res gestæ.* A conversation between the defendant and an accomplice or associate in guilt shortly before the commission of a murder by them, is not competent evidence on behalf of the defendant. It is no part of the *res gestæ.*

5. SAME. *Discharge of juror.* A person selected as a juror in a capital case may be discharged by the trial judge before the jury is sworn upon satisfactory proof by the State that he had formed and expressed an opinion of the guilt of the prisoner, the latter not objecting to the discharge. And there is no error in permitting the other jurors, who had associated with the discharged juror, to remain on the jury, the defendant not objecting to their retention, and the record not showing that he had exhausted his challenges before the jury was completed.

Taylor v. The State..

6. SAME. *New trial.* It is not error to refuse to delay a criminal trial, or to grant a new trial, upon the suggestion that a witness, who had been examined on the part of the State, would "give important evidence on behalf of the defense," the application not showing that the witness had been subpœnaed, where he was, when he could be procured, nor what he could prove, especially if the defendant consented that the witness might leave.

7. SAME. *Res gestæ.* A statement made by the defendant's associate in his presence, and the presence of others, after the commission of a murder that he regretted it, and was forced by the murdered men to kill them, is no part of *res gestæ,* and inadmissible as evidence for the prisoner.

8. SAME. *Indictment.* An indictment for murder in the common-law form is sufficient to sustain a conviction of murder in the first degree.

FROM LOUDON.

Appeal in error from the Circuit Court of Loudon county. A. S. RODGERS, J.

HENDERSON & JOUROLMON, D. R. NELSON and W. L. WELKER for Taylor.

ATTORNEY-GENERAL LEA, W. J. CLIFT, CHAMBERS, PRICHARD and McQUEEN for the State.

COOPER, J., delivered the opinion of the court.

The prisoner, Andrew Taylor, indicted for the murder, on September 14, 1882, of John J. Conway, and found guilty of the crime of murder in the first degree, has appealed in error.

On September 14, 1882, the sheriff of Hamilton county and John J. Conway, his deputy, were in the smoking car of the railroad train in charge of three

prisoners' bringing them from Chattanooga to Knox-
ville for a hearing of their causes by this court upon
appeal.    One of the prisoners was John Taylor, a
brother of the defendant, Andrew Taylor, who had
been convicted of the crime of voluntary manslaughter,
and sentenced to ten years confinement in the peni-
tentiary.    Andrew Taylor, and another brother, Robert
Taylor, had been waiting a week or two at different
points on the railroad, and watching the trains in the
expectation that their brother John would be conveyed
by rail to this place.    They had manifestly conspired
together to attempt to release their brother.    On the
day mentioned, they got on the train at a way station,
entered the car in which the sheriff and his deputy
were sitting with the prisoners, and took a distant
seat.    When the train stopped at the next station,
Robert Taylor strode up the aisle of the car, with,
according to the principal witness, a "steely appearance
in his eyes," followed by the defendant Andrew Taylor.
Conway was sitting next to, and looking out of the
window of the car.    One of the prisoners was occu-
pying the same seat, while the other two prisoners
were on the seat in front of them hand-cuffed together,
John Taylor being nearest to the aisle.    When within
one step of Conway's seat, Robert Taylor drew a re-
volver from his pocket, and presented it at his head,
saying with an oath, "cross your hands."    Before the
startled officer could do anything except turn his face
towards him, dropping at the same time his left hand
from the back of the seat on which it rested, Rob-
ert Taylor fired his pistol and killed him, the ball

passing through the head of Conway. The sheriff, who was sitting on the other side of the aisle two or three seats further on, rose to his feet and presented his pistol at Robert Taylor, saying, "hold on there." At that moment the defendant, Andrew Taylor, fired his pistol at the sheriff, the ball striking him. The sheriff also fired at Robert, but the pistol was struck up by John Taylor, and Robert Taylor then shot the sheriff over John's shoulder. As the sheriff retreated towards the door of the car, Robert and Andrew both again fired at him. Andrew Taylor also continued to snap his pistol two or three times at the sheriff, and when the latter had fallen to the ground, and, as the witnesses say, was pointing his pistol aimlessly around "like a dying man," the defendant gave him a final shot from the steps of the car, which "straightened him out." John was then released, and armed, and the brothers compelled the conductor and enginer to run the train to another station, and made their escape.

The prisoner was indicted for the murder of Conway at the December term of the circuit court, 1882, of Loudon county, in which county the offense was committed. He was afterwards caught in the State of Kansas, and brought back to Loudon on Friday, April 27, 1883. The circuit court was then in session, and the prisoner was at once brought before it, and being without counsel, the court appointed counsel to defend him. The defendant, by his counsel, then demanded a copy of the indictment, which was ordered by the court to be delivered to him. On the succeeding Monday, the cause having been regularly

reached on the docket, the defendant appeared in person and by attorney, and moved the court for a continuance until the next term, the defendant supporting the motion by his own affidavit. The motion was overruled. The court then proceeded to empanel a jury, and try the prisoner. After he was found guilty of murder in the first degree, the court overruled a motion for a new trial, and passed sentence in accordance with the verdict.

The testimony set out in the bill of exceptions is clearly sufficient to sustain the verdict, and the fact has not been seriously controverted by the able counsel of the prisoner. They rely for reversal upon certain alleged errors in the proceedings, and especially upon the refusal of the trial judge to grant the continuance asked for, or to give time to obtain certain evidence with a view to a possible mitigation of the sentence.

The first point made by the defense is that the record does not show that a copy of the indictment asked for by the prisoner was ever delivered to him, and that the trial was commenced before the expiration of two judicial days from such delivery.

By the Constitution of the State, the accused, in all criminal prosecutions, has the right to demand the nature and cause of the accusation, and to have a copy thereof: Const., Art., 1, sec. 9. And by statute: "Every person indicted for a capital offense, if he is in actual confinement, is entitled to a copy of the indictment at least two entire days before trial": Code, sec. 5204. The constitutional right extends to all criminal offenses: *Moses* v. *State*, 9 Baxt., 229.

Taylor *v.* The State.

And the statutory right is imperative upon the courts, unless waived by the prisoner: *Nokes* v. *State*, 6 Cold., 297. But to entitle the prisoner to the benefit of a failure to furnish him with a copy of the indictment, the record must show that the copy was not furnished, otherwise this court will presume that it was furnished, or that the requirement was waived by the defendant: *Davis* v. *State*, 6 Baxt., 429. The record in this case shows that a copy of the indictment was ordered to be delivered to the prisoner, and it fails to show that the copy was not furnished. The indictment was in the ordinary form for the particular crime, and no objection was at the trial made to it in any way. When the cause was regularly called three days after the date of the order, the defendant made no objection that the copy had not been furnished, or that he had not received it two entire days before the trial. He might waive both the constitutional and statutory rights, and the presumption would be that he had waived them in the absence of record evidence to the contrary. He may equally waive the rights in part, and the presumption would be that they had been thus waived, unless the record show otherwise. If, therefore, the Sunday which intervened between the order for a copy of the indictment and the trial was a *dies non juridicus*, so that it should not be counted at common law or under the statute, the defendant might waive the objection, and such waiver must be presumed in the absence of any thing in the record to show the contrary. The defendant cannot be permitted to go to trial on the merits without insisting upon his rights,

and then avoid the result by making the objection for the first time, the additional day being manifestly of no importance for the study of the indictment.

A more serious objection arises upon the motion of the defendant for a continuance of the cause. His affidavit in support of the motion is, in substance, that he is informed by his counsel that a certain person named, who is now in Oregon, can testify to facts material to his defense; and that another person named, who lives thirty-five miles from the place of trial, also knows facts material to his defense, and has not been summoned for the reason that so short a time has elapsed since his arrest. So much of the affidavit as relates to the last person may be at once dismissed from consideration, for he might readily have been summoned in two days, and we hear nothing more of him, although the court was occupied for several days in making up a jury, and several additional days in trying the cause. And, moreover, the testimony of the person was not relied upon on the motion for a new trial.

It was held at an early day in this State, that a defendant in a capital case should not be required to disclose, upon the first application for a continuance, what his witnesses would swear: *State* v. *Morris,* 1 Tenn., 220, The only reason, as this court has subsequently said, upon which such a rule can be founded is that at the first term the accused may not have had sufficient time to ascertain what and by whom he would be able to prove particular facts, and for that reason he should be entitled to one continuance on an affidavit otherwise sufficient, without stating what his

witness would prove: *Nelson* v. *State*, 2 Swan, 482. Whether the affidavit is "otherwise sufficient" is left largely to the discretion of the trial court: *Garber* v. *State*, 4 Cold., 161; *Cornwell* v. *State*, M. & Y., 147; *Sevier* v. *State*, Thomp. Cas., 192. And although the affidavit does show sufficient grounds for a continuance, if upon the trial of the cause it satisfactorily appears that these grounds are false, and fabricated for the purpose of obtaining delay, this court will not reverse because the continuance was not granted: *Porter* v. *State*, 3 Lea, 496.

The affidavit of the defendant may be conceded as sufficient in so far as it undertakes to excuse the failure to have the witness present at the trial owing to his absence from the State, and the short interval of time since the prisoner's arrest. It says that the defendant expects to prove by the witness "that he is not responsible for the crime in said indictment charged, and knows of no other witness by whom he can prove the same fact." If the affidavit is construed to mean that the witness would prove that the defendant did not actually shoot Conway, then the fact is clearly established by the record, and the testimony was immaterial. And if the meaning be that the witness would prove facts to show that the defendant was not responsible for the crime at all, then the record clearly shows that the statement was false, and fabricated for delay.

The record leaves no doubt, and the fact is frankly and necessarily conceded by the counsel of the defendant in argument, that the defendant is guilty of

murder. He was present aiding and abetting his brother in killing the deceased, and the proof establishes, beyond a reasonable doubt, that the killing was in pursuit of a common design, willful, deliberate, malicious and premeditated: Code, secs. 459⁹, 4588. All that the counsel contend for is that the testimony of the alleged witness might have induced the jury to find mitigating circumstances, in which event the court might have commuted the punishment to imprisonment for life. They insist, and, it may be conceded, correctly, that a defendant is entitled as much to evidence which will lessen the punishment as to evidence which will lower the grade of the crime. And they claim that the expected testimony of the absent witness might have had that effect.

This testimony is set out in the affidavit of the defendant's attorney presented upon the motion for a new trial. The affidavit states that he was informed that the absent witness sat on the seat of the railroad car behind the defendant and Robert Taylor on the day of the killing, and heard defendant remonstrating with his brother, protesting against something, the nature of which the witness did not at that time understand, and refusing to do, or take part in something which, though he did not understand, he is satisfied was the rescue of John Taylor, resulting in the killing for which defendant has been tried; and, at the same time, saw Robert Taylor in a violent manner clutch his fist, and shake it in defendant's face, and, with oaths, make him hush, and tell him he had to do it; that he must hush— he had heard as much of that sort of thing as he was

Taylor *v.* The State.

going to, and would hear no more, and perhaps ac-
cused him of cowardice.

The theory upon which this testimony is considered
to be important is that the defendant was influenced
to join in what was done by his brother Robert, and
that the fact might palliate his guilt in the eyes of
the jury. The proof shows that Robert was about
twenty-five years of age at the time of the offense, and
the defendant had about reached his majority. Robert
was, however, a hardened criminal, having served a
term in the penitentiary, and the argument is legitimate
that he was the prime mover in the act in question.

It is to be noted that the affiant does not say that
he had heard the statements proposed to be proved
from the witness himself. On the contrary, the affiant
expressly says that "he was informed" of the facts.
It is also to be noted that the affiant does not say
that he *believes* the statements, and that the defendant
does not offer his own affidavit to the effect that such
a conversation did actually take place. The proposed
testimony is the hearsay of hearsay, uncorroborated, as
it clearly should have been, by the affidavit of the
person or persons who received it at first hand from
the absent witness, and communicated it to the de-
defendant's attorney, and by the defendant's own affi-
davit. The trial judge can scarcely be put in error
by a refusal to grant a continuance or a new trial
upon such an unsupported affidavit.

But if the witness had been present at the time,
would the testimony have been admissible? He would
be called on to testify to a conversation between the

defendant and his brother in relation to the act they were about to commit, if we adopt the conclusion or inference of the witness to that effect. The conversation was no part of the res gestæ. Declarations to be admissible as part of the res gestæ, must be contemporaneous with the act, and tend to characterize it. Declarations explanatory of a previous fact are inadmissible: 1 Greenl. Ev., sec. 108, and notes; Nelson v. State, 2 Swan, 237; Garber v. State, 4 Cold., 161. Conversations between conspirators before the guilty act, not tending to characterize the act, but only bearing on the relations between the parties, could not be introduced by either, nor proved by a third person, at their instance, who might have casually overheard them. They cannot be permitted in this way to make evidence for themselves.

On May 2, 1883, one W. W. Williams, after qualifying himself in the usual way, was selected as a juror, and remained with the other jurors as selected until the panel was completed on May 4. After the panel was made up, but before the jurors were sworn, the attorney-general, in the absence of the jury, moved to discharge Williams upon the ground that he had formed and expressed an opinion as to the guilt of the defendant. He introduced, in support of his motion, the affidavits of two witnessess that they had heard Williams express the opinion that the defendant ought to be hung, and the affidavit of a third person that he had detailed all the circumstances of the killing to Williams some time after the event occurred, and that Williams remarked that if the defendant was

Taylor *v.* The State.

caught he ought to be hung without law, or gospel, or judge, or jury. The defendant objected to the sufficiency of the affidavits, whereupon the court asked him if he objected to the discharge of the juror. The defendant replied that he did not object to the discharge of all the jurors. Williams himself, when interrogated by the court on the subject of the affidavits, said that the affiants were respectable and truthful men, and he would not say positively that he had not expressed himself to them as stated, although he had no recollection of having done so. The court then discharged Williams, and supplied his place with another juror.

The facts as shown by the affidavits upon which Williams was discharged would have been sufficient to have sustained a motion for a new trial by the defendant under the decisions of this court, and there was consequently no error in discharging him in advance: *Draper* v. *State,* 4 Baxt., 253; *Hines* v. *State,* 8 Hum., 599. No serious argument has been submitted against the propriety of the discharge, but the point is made that the court should have at the same time discharged all the jurors, because of the fact that the incompetent juror had associated with the residue of the panel for two days. No doubt the court might have discharged the entire jury, if, in the exercise of his discretion, he had thought the ends of justice re quired such action: *Griffee* v. *State,* 1 Lea, 41. But the question is, whether the trial court was compelled by law to discharge the jury, without more, merely because one of the jury had previously formed and

expressed an opinion adverse to the defendant? The defendant did not object to the other jurors because of their association with the incompetent juror, nor ask for their discharge, nor offer to show that anything improper had passed between them and the discharged juror. Upon principle, in the absence of any thing else, the mere association of selected jurors with one of their number who had formed and expressed an opinion as to the guilt of the defendant, would no more render them incompetent than such association previous to the trial. And no decision has been cited holding otherwise.

It has been held by this court that the separation of a juror from his fellows, unless satisfactorily explained by the prosecution, is a sufficient ground for a new trial: *Hines* v. *State*, 8 Hum., 597. The burden of proof is upon the State to explain the separation, not upon the defendant to show actual injury, and the analogy of that class of cases to the case before us has been strongly pressed upon the court. But there is no analogy between the two cases.

A juror who separates from his fellows is guilty of a positive violation of his duty, and thereby creates a *prima facie* case against him, which requires to be met by countervailing testimony. But jurors who simply remain with the delinquent juror are merely performing their duty, and are not thereby put in fault. The burden was, therefore, upon the defendant to show improper communications by their associate, or to establish some fact to create a suspicion against them. Until a *prima facie* case of

taint is made out, there is no necessity of explanatory evidence.

A real analogy would exist if the separated jurymen were allowed to remain on the jury by the defendant in the full knowledge of the fact of separation, or still better, if the defendant, after the delinquent juror was discharged, failed to except to the other jurors who had associated with him subsequent to the separation, upon the ground of such association. But these points may be said to have passed into judgment. It is well settled that if a juror, incompetent for the reason that he had expressed an opinion, has been selected upon the jury, and the record fails to show that the defendant had exhausted his challenges, the objection is waived even in a capital case: *Presswood* v. *State*, 3 Heis., 468; *Holcomb* v. *State*, 8 Lea, 420. The record in this case does not show that the defendant had exhausted his challenges. In *Griffee* v. *The State*, 1 Lea, 41, after six jurors had been selected and placed in charge of an officer, two of them separated from their fellows, but were brought back, and remained with the others until the court met next morning. The trial judge discharged all the jurors, but made an order that the four jurors who had merely associated with the delinquents should be upon the panel for a new jury. The defendant made no objection to the panel, nor did he object to three of the four jurors when passed to him by the State. The court, however, of its own motion, discharged these three jurors, and a jury was selected before the defendant's challenges were exhausted. The

46—VOL. 11.

court said by Judge Freeman: "There is no reversible error in this question in any aspect of it." In *Cantrell* v. *State*, 1 Leg. Rep., 193, it was shown, upon a motion for a new trial, by the affidavit of one of the defendant's attorneys, that one Fultz, a juror, when asked in his *voire dire* whether he had formed an opinion, said that he had, and believed defendant guilty, but that the reply did not reach the ear of his counsel until after he had taken his seat. His attention was then called to it by another member of the bar, and no objection was made, Judge Freeman, in delivering the opinion of the court, said: "This cannot aid defendant. He should have objected at once, and presented the facts to the court, when the juryman would have been set aside. He cannot remain quiet under such circumstances, and by his conduct accept the juror after the objection comes to his knowledge, especially when the fact is known before the jury is made up or trial commenced, and then have a new trial when the verdict is found against him." Both of these were convictions of murder, one in the first and the other in the second degree. The case before us clearly falls within the principles settled by them.

The bill of exceptions shows that at the close of the testimony in the cause, the defense stated that N. J. Bell, who had been examined on the part of the State a few days before, would give important evidence on behalf of the defense, and asked the court to give them time to get the witness to the place. The application did not show that the witness had been subpœnaed, where he was, or when he could be procured,

nor what the witness could prove. Of course there
was no error in the ruling of the court upon such
a showing. In the affidavit of the defendant's attor-
ney used upon the motion for a new trial, it is stated
that the attorney had himself permitted the witness to
leave the place of trial and go to Knoxville upon his
promise to return the next morning, under the expec-
tation that the trial would not close as soon as it
did. Bell was the conductor of the train on which
the killing occurred, and proved, when examined by
the State, that he had stepped off of the cars before
the shooting occurred, and that after the sheriff had
fallen, he ordered the local agent of the railroad com-
pany at the station to go for a physician. After this,
he says, he looked around, and saw pistols pointed at
him by men standing on the platform of the smoking
car, who directed him to start the train. He told
the engineer, who was also on the ground, to move
away as quick as he could. The witness then stepped
on the front platform of the smoking car, and went
in behind the men who had pointed their pistols at
him. When he got inside, the larger of the men
presented his pistol at him, and asked him if he was
armed. He replied that he was not, and John Tay-
lor told the other not to hurt the witness as he was
his friend. The witness then details what he saw and
heard thereafter. During the subsequent conversation,
but exactly at what time is not stated, the affidavit
for a new trial undertakes to say that the witness
would depose that while the brothers had their pistols
in their hands, Robert Taylor, in the presence of the

defendant, said that they regretted having killed the sheriff and Conway, that they did not intend so doing, but the sheriff and Conway forced them to do it.

If this alleged testimony was at all material, the affidavit shows that the defendant failed to have it before the jury by his own fault. But it is clearly both immaterial and incompetent. The expression of regret for a murder amounts to nothing, and Robert Taylor's statement that he was forced to commit the deed by the deceased is falsified by the testimony of all the witnesses. The affidavit undertakes to say that the conversation was a part of the *res gestæ*. But this is a mere conclusion of the draftsman, and a clear mistake. The deed had been done, and the guilty parties could not by what they might afterwards say make evidence for themselves.

The indictment in this case is in the usual common-law form. One of the defendant's counsel insists that the indictment is insufficient to sustain a conviction of murder in the first degree. It is well known that one of our most distinguished writers on criminal law has always maintained the view contended for, and one of the judges of this court has reached the same conclusion: *Poole* v. *State*, 2 Baxt., 288. But the weight of judicial authority is that as the common-law form of indictment included all grades of murder, the statute dividing murder into degrees only affects the evidence and the punishment, not the forms of pleading: 2 Bish. Crim. Prac., sec. 569, *et seq.*, where the authorities are given, while the learned author dissents from them. In this State, in the

very act in which the crime was divided into grades, the Legislature expressly provided that the indictment should be sufficient if the offense was charged or described according to the common law, and this provision of the statute was brought forward into the Code, sec. 5119.    This court, in the first case which came before it under the statute, where the point was distinctly made and argued with marked ability, held that the indictment in the common-law form was sufficient: *Mitchell* v. *State*, 5 Yer., 340.    And the decision has been repeated from time to time, and uniformly adhered to.    We see no sufficient reason for departing from the ruling.

It is contended that his Honor, the trial judge, failed to tell the jury what a conspiracy was, and erred in charging upon lying-in-wait as an element in murder in the first degree.    But the defendant was not indicted for a conspiracy, and was indicted for murder in which lying-in-wait may be an element.    If there were no lying-in-wait, the charge would do no harm. The second special request only asks what the judge had already charged, that the jury must find that the Taylors "were guilty of lying-in-wait to carry out their common purpose to kill any one who should oppose them."    So of the remaining request that if the jury had doubts as to whether the defendant was guilty of one of any two degrees of homicide, they should find him guilty of the less grade.    For his Honor had already charged that the jury could not find the defendant guilty of any grade of homicide unless satisfied that he was guilty of that grade be-

yond a reasonable doubt. Much of the argument submitted to us in behalf of the prisoner was based upon the idea of great popular excitement against the prisoner. But there was no application for a continuance on that ground, nor is there any thing in the record indicating such a state of affairs, or tending in the least to show that the trial was otherwise than fair and impartial.

There is no error in the record, and the judgment must be affirmed.

FREEMAN, J., delivered the following dissenting opinion :

I am compelled to dissent from the opinion of a majority of the court on one question. I think the panel should have been discharged, or a new trial granted, because of the fact, that the juryman who had formed and expressed an opinion against the prisoner was permitted to mingle with the jury probably for several days, having obtained this position by what presents the gravest suspicion to my mind of corrupt perjury. This party is shown to have been so prejudiced against the prisoner as to authorize his discharge on the facts being presented to the court. He is shown to have said repeatedly in substance that the defendant should be hung without law, judge or jury, thus indicating a most emphatic bias and eagerness to see the prisoner punished regardless of and without the forms of law. I think the refusal to consent to the discharge unless all were discharged, sufficiently raises the question.

Taylor *v.* The State.

We have held in numerous cases that if the jury are permitted to mingle with strangers, or they are permitted access to the jury, nothing more appearing, a new trial must be had. The principle is, that wherever there has been opportunity for receiving improper influence, the prisoner has a case for a new trial, until the State shall show by proof that no evil influences has been exerted. The fact of contact with others is held sufficient and a plenary ground for new trial, until explained by proof removing the presumption and inference of law showing the jury had not been improperly tampered with.

Concede this to be settled law, as it is by all our decisions, then the question is whether we have a case coming within these established principles? As a matter of course the facts of every case are slightly variant in detail, but the real inquiry is, whether the rule of decision is different as applied to the essential facts in this, and in the cases to which I have referred. The principle is one of public policy, in favor of the administration of justice. If the jury *may have been tampered* with, this unexplained is enough for a new trial.

If the jury have been seen to separate, or one is absent from the others not in care of his officer, or in passing through a crowd in one case, and persons mingled with them in that way, the fatal taint is given, and must be removed. This rule is simple and of easy application. It is that the presumption of taint arises whenever an opportunity and exposure to danger of it is shown. This presumption

Taylor *v.* The State.

must then be removed by proof, or the verdict is vitiated. Now let us apply this principle to the case in hand. We have here a man infected, as shown, with a most. definite and determined bias against the defendant, not simply having a casual communication with the jury, but he is thrown with them in the most intimate relations—is privately with them in their rooms, and sleeps with them for night after night—how it can be said this raises no presumption of taint, I am unable to see, while if the jury had been passing from the court-house to their room, and he had been seen casually conversing with a member of it, would be hopelessly infected until the taint was removed by proof, is more than I am able to see. A sanitary committee who should require parties to be quarentined and disinfected before mixing with their fellow-citizens, who had been in a civil district or a neighboring village where an epidemic prevailed, might be criticised for over-prudence in precaution, and be compelled to justify their conduct on the plea of danger to human life and the importance of taking all precautions against a dangerous infection. But if that same committee were to decide after this that it made no difference at all if parties had freely mingled with, even slept with, a patient who had the small-pox fully developed, or had been for days in a room with a man who had the black vomit, it might possibly be that no infection should result, but the vindication of their consistency, would, it strikes me, be a difficult problem to be solved.

I think this a parallel case. My brethren would

Taylor *v.* The State.

be bound, under our decisions, to say this jury were tainted if they had mingled with the general mass of the community, where we might assume there existed in all probability a sporadic case of prejudice against the prisoner, but when we find them in contact and intimate association for days with a party actually proven to have been virulently infected with a determined bias against the prisoner, the theory of the opinion, as I understand it, is that this is harmless. Practically it may be true that no juryman has been infected by the noxious virus, but logical consistency, and a sound adherence to consistency in the application of settled principles demands the same result shall follow in the one case as the other.

It may be argued the jury were in charge of an officer, and instructed not to converse with any one about the case. But so they are in case of mingling with a crowd, or having communication with others; yet this has never been suggested as any cause to change the rule. Can it be that the form in which the mingling shall take place can change the principle that if a juryman shall separate from his fellows, or be approached and spoken to from without, the taint arises, but if the man is inadvertently turned into their private room, or perjures himself to get his opportunity, and so gets in by swearing he had expressed no opinion, when in fact he had, that this make no difference in the two cases? My brethren are compelled to assume the affirmative on their theory. I am simply unable to see the soundness or logical consistency of that view.

Taylor v. The State.

The facts in this case have, it is true, elements of difference from the cases heretofore, and therefore are not precisely parallel. But the main element of difference is, that this presents a much stronger case of danger of infection from without than our decided cases, and therefore the demand is for a more stringent enforcement of the rule established for the protection of the purity of the jury trials. So I see it—and assuredly such an element can furnish no ground for a relaxation of these rules, such relaxation could only stand on the theory of the more danger the less precaution demanded to guard against it.

It may be the jury could have been purged by showing that no communication with the prejudiced juror was had; it may in fact be that none was had in the case. But I can but think that logical consistency and the unbending application of established principles demands that we should follow these rules to their legitimate results, even at the cost of some delay in meeting out justice to a criminal, be the grade of his crime what it may. To make haste slowly, when the law is to be vindicated, and to be sure its rules shall be felt to be unbending, is, I think, the soundest of policy.

Frankly conceding that I may be wrong, and my brethren right in their views, I am compelled to follow my own judgment, and maintain the right as I see it.

For these reasons, and others that might be given, I think it was the imperative duty of the court, when the juror was discharged, either to have seen that the

jury was purged from all infection by an examination conducted by him, and if this was not done, then to have discharged the entire panel and summoned a new one, free from an opportunity of being tainted. I therefore dissent on this point from the opinion of the majority of my brethren.