Isaac H. Ivy *v.* State of Tennessee.

*(Jackson,* April Term, 1954.)

Opinion filed March 11, 1955.

Rehearing denied April 7, 1955.

R. GARLAND DRAPER and JAKE GREEN, both of Memphis, for plaintiff.

KNOX BIGHAM, Assistant Attorney General, for the State.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

The defendant, Isaac H. Ivy, was indicted by the Shelby County grand jury on September 27, 1951, for the alleged murder of Martin Junior Vanderberg on September 15, 1951, and was tried on January 22, 1952, as a result of which he was found guilty of murder in the second degree.

On appeal to this Court the judgment of the Trial Court was reversed and the case remanded for a new trial, this Court being of opinion that the weight of the evidence was against the verdict as tending to show that one Adkins was the aggressor in the conflict between him and Ivy.

The defendant was tried again on September 25, 1954, as a result of which he was convicted of involuntary manslaughter with a maximum penitentiary sentence of three and one-half years, and the case is here again on appeal from the second conviction.

The tragedy occurred about 1:00 o'clock in the morning in the parking area in front of a night-club called Gypsy Village when during the course of a fight between Ivy and Adkins, Ivy stabbed his cousin Martin Vanderberg, Jr. in the chest, as a result of which Vanderberg shortly thereafter died.

The first five assignments of error and the argument thereunder deal with the facts of the case. It is hardly necessary to repeat that the verdict of the jury is conclusive as to the credibility of the witnesses. Also that an accused convicted in the Trial Court comes to this Court under a presumption of guilt and under the burden of showing that the evidence preponderates against the verdict below and that, assuming the credibility of the witnesses to have been settled by the verdict of the jury, we can only review the evidence for the purpose of determining whether the same preponderates against the judgment below, as is described in *Cooper v. State,* 123 Tenn. 37, 56-61, 138 S. W. 826.

On the evening of September 15, 1951, the defendant Ivy and his wife, Mr. and Mrs. Martin Vanderberg, Sr., and Mr. and Mrs. James Frazier got together and decided to go to this night-club which is on the outskirts

of the City of Memphis. They obtained a fifth of whisky and each one had one drink before they left in the car of the defendant, and arrived at the night-club about 10:00 P. M.

In front of the night-club which is on the east side of the highway, there is a grass plot seven or eight feet wide contiguous to the building, and then a line of posts demarking this grass plot from the graveled parking area, and the photographs show that there is a narrow strip of grass of probably two or three feet between these posts and the gravel which constitutes the parking area. These posts extend southward to about the south side of the night-club building, then there is a driveway going on the south side of the house to the rear.

When this party arrived at the night-club the defendant parked his car at the south end of these posts near the driveway.

After they had been in the night-club for thirty to forty-five minutes Mr. Vanderberg Sr., telephoned his son, the deceased, to come on down and about 11:00 o'clock the deceased and his wife accompanied by Mr. and Mrs. Raymond Adkins, arrived and joined the first group at a large round table, bringing with them another fifth of whisky complementing what was left of the original supply brought by defendant's party. It seems that everybody had a drink or drinks, although it is asserted by everybody that no one was drunk, and they remained there dancing and most of them enjoying themselves apparently, until after half-past twelve.

There was evidently some unpleasantness between Adkins and Ivy, but no evidence whatever, that the deceased was involved in any way other than as a peacemaker. Ivy testified that Adkins made himself obnoxious from the moment he came in, asserting that he was a

member of the Memphis police force, intimating that he had a gun, and generally acting a "bully," although in Ivy's statement to the police given and taken down the next morning, he was questioned in part, and gave answers as follows:

"Q. Was you mad at Adkins at any time last night? A. I wasn't mad at him, he did some things that I didn't like.

"Q. What did he do that you didn't like? A. He poured me out a drink of whisky and I didn't like that and just the way he met me.

"Q. Why did you get in a fight after you left the Gypsy Village? A. I don't know, me and old man Vanderberg was standing up by the side of the car talking and Vanderberg said something and I said, 'there ain't no son-of-a-bitch going to run me home,' and old man Vanderberg said, 'who is he,' and I said, 'they act like they don't want me in their party,' and he asked me if I was going home and he said that he was going to ride with his boy. About that time Adkins walked up with Vanderberg, Jr., and Adkins hit me. I don't know whether he hit me behind or under my eye. I had been cleaning my fingernails and had my knife in my hands. We just started fighting and I started cutting.

"Q. Did Vanderberg get into the fight or was it just you and Adkins? A. He was in it. He was close enough to get cut.

"Q. Do you remember cutting anybody? A. I didn't even know whether I cut anybody or not but I tried to.

"Q. When was the first time that you knew Vanderberg had been cut? A. When I was over in the doctor's office at the McLemore Clinic.

"Q. What was your opinion of Adkins last night when you first saw him? A. When he introduced himself to me I thought he was pretty nice fellow."

On the other hand—Adkins claimed that he himself did nothing out of the way; that young Vanderberg said something to him about going to the lavatory, that he looked over to Ivy and asked him if he would like to go and that Ivy said he didn't want to go "no god-damn place," and the evidence, in part, contains the intimation that Ivy did not dance or get out of his chair during the evening and rather seemed to sulk.

However these facts may be, it was a question for the jury to resolve.

When the party began to break up Mr. and Mrs. Frazier and Mr. and Mrs. Ivy went outside and got in Ivy's car, then Mr. Vanderberg, Sr., came out to this car and Ivy testified that he again got out of his car for the purpose of letting Mr. Vanderberg slide in on the front seat with him and Mr. Frazier, but that Mr. Vanderberg told him, and the fact is not in dispute, that he and his wife would ride back with his son, the deceased. Ivy testified that he and Mr. Vanderberg then began talking about getting Mr. Vanderberg's automobile repaired the next day, and that he had his pocketknife open and was cleaning his fingernails when Adkins came out of the Gypsy Village, followed by the deceased, and while Ivy was standing between his car and the one next on the left and standing beside the door of his car, Adkins made some remark to the effect, "let me have him," and rushed down and hit him a hard lick with his fist in the left eye, and that he, Ivy, then started slashing with his knife and that if he did cut his cousin, the deceased, he didn't know anything about it until after Ivy himself had gone to the McLemore Clinic to get his own wounds bounds up, Ivy having re-

ceived a practically closed left eye from the blow of Adkins' fist and later a lick on the head with a rock thrown by Adkins.

Adkins testified that his wife and Mrs. Vanderberg, Jr., had gone on to their car which was parked about 15 feet south of the Ivy car, and when he came out of the building with Vanderberg, Jr., following him, he walked down the narrow strip of grass on the outside of the posts and stopped in front of Ivy's car and told Ivy that he was sorry if he was mad, and Ivy replied that if he got mad he would do something about it. That Adkins turned to walk on when he heard a scuffling in the gravel behind him and turned his head just in time to receive a blow in the forehead, that a fight ensued and that Ivy cut Adkins a number of times. He said he then heard his wife scream and he ran and pushed her out of the way, and then he saw Vanderberg, Jr. with his hand on Ivy's shoulder and saw Ivy strike him. That he then picked up a rock, ran up close behind Ivy, threw the rock and struck him in the head.

Adkins' testimony is corroborated by that of Mr. Vanderberg, Sr., who testified that when he saw the open knife in Ivy's hand he asked him what his intentions were and Ivy replied that he was not going to let anybody run over him; that having told Ivy he and Mrs. Vanderberg, Sr., were going back in the car with their son he turned to go toward the building when he met Adkins and young Vanderberg walking in the direction of the Ivy car; that he heard a noise behind him and when he looked around he saw Ivy coming from behind the cars with the knife in his hand, and that Ivy struck Adkins and the fight ensued; that after Adkins had withdrawn to push his wife back toward their car, young Vanderberg put his hand on Ivy's shoulder and remonstrated

with him for having cut Adkins, and that Ivy then stabbed young Vanderberg in the chest.

The testimony of Vanderberg, Sr., and Adkins is corroborated by Mrs. Adkins.

Just before the fight started three couples came up on motorcycles. Some of them did not know what happened while others testified that the first they saw when they looked around was Adkins striking Ivy; but an examination of their testimony makes it rather clear that none of them undertook to testify that they saw the start of the fight.

Ivy was corroborated by some of his witnesses in support of his claim that he was not the aggressor but that Adkins was. As to the question of who was the aggressor, it was necessarily a question of fact for the jury to resolve. It, therefore, seems to us that in view of the fact that two juries have found against Ivy after having seen and heard the witnesses testify, we would be presuming upon our prerogative to hold that the evidence preponderates against the verdict. This is said with reference to the particular question of fact as to which one was the aggressor.

Yet there is another theory presented by the evidence of the State that would make the question of which one was the aggressor non-determinative. Conceding for the sake of discussion that if Adkins were the aggressor and that the defendant was legally exercising his right of self-defense and in doing so a bystander was injured or killed, the defendant would be guilty of no crime. Under the same circumstances if Mr. Vanderberg, Jr., was intervening as a peacemaker and was unintentionally wounded or killed, the defendant would be guilty of no crime. There is some evidence to show that this is what occurred, that is, that it occurred as part of the res gestae.

On the other hand, there is very substantial evidence to the effect that Adkins had quit the fight at least temporarily, while he was in the act of shoving his wife back away from the area where the first encounter occurred and that it was then that the deceased is said to have placed his hand upon the left shoulder of the defendant and to have asked the defendant why he had cut Adkins. The jury was entitled to believe this theory of the evidence and if they did, the danger or supposed danger to Ivy was not then imminent.

In *Hull* v. *State,* 74 Tenn. 249, in explaining the meaning of the expression that the danger must be present at the very instant, the Court very rationally says that time is not to be measured by seconds when one is exercising the right of self-defense, but that the entire circumstances are to be taken as a series of events. Yet if Adkins had withdrawn from the affray to the extent that he was engaged in getting his wife out of the way at the time that Ivy is said by some of the witnesses to have inflicted the mortal wound on the deceased, then the danger was not imminent and there was no justifiable reason for the stabbing of the deceased except upon the theory that the defendant was half blinded and addled to the extent that he did not know what he was doing. This theory was developed particularly by the testimony of the defendant and obviously rejected by the jury, and so again we have the question of credibility which was for the jury to settle.

We are, therefore, of opinion that on either theory of the State, that is, that Adkins was not the aggressor or that if he was, the danger was not imminent at the time the defendant inflicted the wound upon the deceased, the jury was warranted in finding the defendant guilty of involuntary manslaughter.

We, therefore, overrule the first five assignments of error.

The sixth assignment complains of the refusal of the Court to instruct the jury to enter a verdict of not guilty or to itself enter a verdict of not guilty. This Court has repeatedly held that such is not the proper practice. *Taylor* v. *State,* 191 Tenn. 670, 235 S. W. (2d) 818.

Assignments seven to thirteen inclusive, complain of the refusal of the Court to give special requests, all of which relate to self-defense. These assignments must be overruled because the Trial Judge gave a full charge on self-defense that covered every point raised by these special requests, and in language that is clear and intelligible.

The fourteenth assignment complains of the special request of the State which the Court gave with reference to the State's theory that the deceased approached Ivy only as a peacemaker, etc. This was not covered in the general charge and was properly given.

The fifteenth assignment of error complains of the refusal of the Court to grant the motion for a new trial based on alleged newly discovered evidence. This is based upon the affidavit of a Mrs. Hester whose husband testified at the trial.

This assignment must be overruled for two reasons: (1) Because the evidence is cumulative, and (2) because the motion is not supported by any affidavits showing diligence on the part of the defendant and his counsel. *Ross* v. *State,* 130 Tenn. 387, 170 S. W. 1026.

*(8)* The last assignment of error complains of the admission in evidence of the statement taken from defendant by the police officers at 9:00 o'clock the next morning after the tragedy. The record shows that the Trial Judge had a full hearing on the competency of this statement

before admitting the same in evidence, as was his duty to do, and found that it was voluntarily made. We have examined the evidence and we are of opinion that it does not preponderate against the finding of the Judge, and the assignment is, therefore, overruled.

The judgment of the lower Court is accordingly affirmed.