STATE OF TENNESSEE

*v.*

OVANLEY FOWLER and VAN DUNHAM.

373 S. W. 2d 460

*(Nashville,* December Term, 1962.)

Opinion filed December 5, 1963.

JIM CAMP, LUCIUS CAMP and GEORGE O. BRADLEY, Sparta, for Van Dunham.

T. EUGENE JARED, Cookeville, of counsel, MADDUX, CAMERON & JARED, Cookeville, for Ovanley Fowler.

GEORGE F. McCANLESS, Attorney General, WALKER T. TIPTON, Assistant Attorney General, for the State.

MR. JUSTICE FELTS, delivered the opinion of the Court.

Plaintiffs in error, herein called defendants, Van Dunham and Ovanley Fowler, along with Bobby Lowery and Donald Lowery, were jointly indicted for larceny of a safe, containing $400.00, the property of the Ideal Furniture Company of Sparta, and of a Ford truck belonging to Jerry Mitchell. The Lowery brothers admitted their participation in the crime, pleaded guilty and are not defendants in this case. Defendants Dunham and Fowler, however, were tried together and found guilty of the

larceny and their punishment fixed at three years in the penitentiary, and judgment was entered accordingly.

The defendants brought the case to this Court by an appeal in error, challenging the sufficiency of the evidence, to sustain their conviction and seeking a reversal and new trial upon a number of other grounds.

It is not the province of an appellate court to make an argument upon the facts in a case of this character or go into detail on the question of credibility of witnesses or slight discrepancies in their testimony. *Cooper v. State*, 123 Tenn. 37, 60, 61, 138 S.W. 826 (1909); *Barnett v. Thirkield*, 201 Tenn. 528, 538, 300 S.W.2d 905 (1956). Therefore, we state only our conclusions and such facts as are necessary to an understanding of the case.

Sometime during the night of September 8, 1961, or early morning of September 9, several unidentified persons burglarized the Ideal Furniture Company of Sparta, Tennessee, and stole a safe containing approximately $400.00. In conjunction with the burglary, they also "straight wired" and stole a 1951 Ford truck of Jerry Mitchell.

The day following the burglary, two suspects, Bobby Lowery and Donald Lowery, were arrested and both admitted their participation in the burglary and theft of the truck and safe. At the same time, they undertook to implicate the defendants Fowler and Dunham in the crime.

The Lowery boys testified for the State that on the evening of Friday, September 8, Bobby Lowery, who had borrowed the defendant Van Dunham's green Ford

station wagon, by chance ran into his brother, Donald Lowery, at the White County Fair in Sparta. A little later (after they had left and returned to the Fair), they ran into both defendants, and after some discussion, defendant Fowler indicated he wanted some help "on a job." As a result, a little before midnight, the two defendants, along with the Lowery brothers, left the fairgrounds in Dunham's station wagon, drove to Sparta, and stole the Ford truck and burglarized the furniture store, transporting the safe out of town in the stolen truck.

These accomplices further testified that after the store had been successfully burglarized, the party headed out of Sparta, Donald Lowery and defendant Fowler in the truck, and the other two men following in Dunham's station wagon. They drove the two vehicles out Highway 84, and proceeded to the defendant Fowler's farm where some tools were procured from defendant Fowler's brother, Leotis Fowler, and the safe was opened. Afterwards, the group divided the money and burned the other contents of the safe.

The testimony of the Lowery boys as to the manner of exit was substantially corroborated by another of the State's witnesses. It was also shown by the State that during the investigation of the burglary a pile of ashes was found on Fowler's farm approximately where the Lowery brothers testified they had divided the money and burned the papers which were in the safe.

The State also introduced disinterested witnesses who testified that on the night in question, they had seen four men moving around in the vicinity of the Furniture Company. They also stated that, later, four men came down

the street and drove off with a truck parked behind the telephone company and proceeded to the vicinity of the Ideal Furniture Company. A while later, according to their testimony, the same truck drove off with a station wagon following it. These witnesses, however, were unable to identify any of these men.

It was further shown by the State that defendant Fowler's brother had signed a statement to the effect that he had aided the group in opening the safe by loaning them some tools. On the witness stand, however, he emphatically denied the truth of the statement and insisted that he signed it only because of fear and coercion.

Evidence for the defendants undertook to establish alibis. Defendant Dunham testified that he was with Bobby Lowery on the day preceding the burglary; that he had loaned his station wagon to Lowery and they had gone to the Fair and gotten drunk during the afternoon; that Lowery left him at his father-in-law's house about 7:00 P.M. on the night in question; and that he did not see Lowery or the station wagon again until the day after the robbery.

Dunham further testified that he did not wake from his drunken sleep until about 10:00 P.M., when he left his father-in-law's place and went back to the Fair. He said he parked his car in the lot at the fairground, proceeded to pass out from his drunken condition, and remained in the car until found by his wife and father-in-law shortly before dawn. His wife and other members of her family substantially corroborated his story.

Defendant Fowler undertook to establish a similar alibi. He testified that on the night in question he was at

the White County Fair along with several other members of his family, and that he did not see either Dunham or the Lowery brothers at all that night. He stated that about 12:15 A.M. he and his family left the Fair and drove to their home which took approximately 45 minutes, and shortly after their arrival, several other relatives, also on their way home from the Fair, dropped by for a short visit. After the guests left, defendant testified that he went to bed and did not leave the house again until 6:00 A.M. the next morning. Some nine witnesses, all close relatives, however, substantially corroborated his alibi.

In the first three assignments of error, it is insisted that the only direct evidence in the record tending to connect defendants with the crime is the testimony of the Lowery brothers, admitted accomplices in the burglary; that the State has failed sufficiently to corroborate their testimony; and that, therefore, the evidence does not sustain the verdict.

We consider these assignments together, for there can be no question about the sufficiency of the evidence, if there is substantial corroboration of the testimony of Bobby and Donald Lowery, the two admitted accomplices of defendants in the crime.

Under the common law, the testimony of an accomplice, if it satisfies the jury beyond a reasonable doubt of the guilt of the defendant, may be sufficient to warrant a conviction although it is uncorroborated. The rule in this State, however, requires corroboration, and there should be some fact testified to entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been

committed, but that the defendant is implicated in it, and the corroboration must consist of some fact that affects the identity of the party accused. *Clapp v. State,* 94 Tenn. 186, 195, 30 S.W. 214 (1894); *Sherrill v. State,* 204 Tenn. 427, 433, 434, 435, 321 S.W.2d 811 (1958); *Garton v. State,* 206 Tenn. 79, 87, 88, 332 S.W.2d 169 (1959).

The State undertook to corroborate the testimony of the accomplices by a number of circumstances. First, it introduced evidence that on the night of the crime, both defendants were seen talking with the Lowery brothers at the Fair in Sparta. Secondly, it adduced evidence that Dunham's dark green Ford station wagon was seen by two disinterested witnesses near the scene of the burglary on the night in question.

We think further corroboration is afforded by the testimony of the same disinterested witnesses who saw four unidentified men go behind the telephone company and drive away in the truck with which the defendants are now charged with stealing. Finally, the State proved that ashes of burned paper were found on defendant Fowler's farm at a spot about where the accomplices confessed that, after dividing the money, the group had burned the papers which were in the safe.

In addition, when the defendants were formally confronted by the implicating statements of the accomplices, the record shows that they hung their heads and made no audible response. In *Alexander v. State,* 190 Tenn. 260, 267, 229 S.W.2d 331 (1949), this Court, faced with a similar question in a prosecution for breaking and entering, held that when defendant was confronted with accomplices and their written confessions were read to him,

and he replied that he had nothing to say, and that he knew where the stolen clothes were, his actions were admissible for the purpose of corroborating the testimony of one of the alleged accomplices. See also, *Winfree v. State,* 174 Tenn. 72, 74, 123 S.W.2d 827 (1937).

 Furthermore, this Court held in the case of *Winfree v. State,* supra, that slight circumstances may be sufficient to furnish the necessary corroboration of an accomplice. In the present case, the circumstances, in addition to the proven facts, are more than slight. Therefore, although they are admitted accomplices in the larceny, we think that the testimony of the Lowery brothers is sufficiently corroborated to support the conviction.

 Moreover, in considering these assignments of error, we are met by a verdict of guilt which, according to a long line of decisions, displaces the presumption of the defendants' innocence, raises an inference of guilt in this Court, and puts upon them the burden of showing that the evidence preponderates against the verdict and in favor of their innocence. *Ivy v. State,* 197 Tenn. 650, 652, 277 S.W.2d 363 (1954); *Anderson v. State,* 207 Tenn. 486, 495, 341 S.W.2d 385 (1959). In this case, we do not think defendants have satisfied this burden, and therefore, overrule these assignments of error.

During the voir dire, the regular jury panel was apparently exhausted by dismissals for cause, and the defendants proceeded to challenge all of the other veniremen. This challenge was overruled by the trial judge and defendants contend that this prejudiced their cause and was reversible error.

We can find in the bill of exceptions no evidence that any of such alleged illegalities complained of actually

occurred. It is true that counsel in open court made the charge that the sheriff had drawn the names of the veniremen or prospective jurors, but neither the sheriff nor anyone else was introduced as a witness to prove these charges; and the bill of exceptions as certified by the trial judge contains no proof to support such charges.

■ It is true the same matters are asserted in the motions for a new trial, but this is not sufficient since such a motion is a mere pleading and is no evidence or proof of the truth of the fact asserted by it; and affords no basis for this assignment of error. *Sherman v. State,* 125 Tenn. 19, 51, 140 S.W. 209 (1911); *Dupes v. State,* 209 Tenn. 506, 513, 354 S.W.2d 453 (1961).

Defendants further insist that the trial judge erred in declaring an emergency when the regular panels were exhausted, and in directing the sheriff to summons from the body of the county, 25 people to be examined for jury service.

■ T.C.A. sec. 22-233(b), however, provides that whenever the presiding judge is satisfied that a jury cannot be obtained from the regular panel, because it has been exhausted, he may "in his discretion select from citizens of the county or direct the sheriff to summons persons of his selection * * * and make up the jury therefrom to try the case * * *." We think that by virtue of this statute, the trial judge has a discretionary power to direct the sheriff to summons additional persons for jury service.

■ In cases involving the exercise of the trial judge's discretion, we have repeatedly held that this Court will not set his action aside except upon a showing of an abuse

of such discretion which prejudiced the rights of defendant. *Porter v. State,* 71 Tenn. 496, 499 (1879); *Kennedy v. State,* 186 Tenn. 310, 319, 210 S.W.2d 132; *Stallard v. State,* 187 Tenn. 418, 215 S.W.2d 807. Since we are unable to see that any prejudice has resulted from this discretionary action, this assignment of error is without merit and is overruled.

Defendants also complain that the trial court erred in denying their motion for a mistrial which was based on the alleged ground of a separation of the jury prior to the verdict. It is argued that during the selection of the jury and before it had been empaneled and sworn, three instances of separation took place.

This Court, however, can consider only the two separations which are supported by affidavits or the evidence embodied in the certified bill of exceptions. *Sherman v. State,* supra.

After the seventh or eighth prospective juror had been selected, counsel for defendants were asked by the trial judge if they would acquiesce in allowing a juror named Harris, who had already been accepted by both sides, to go home and water his tobacco patch. Unfortunately, this request was made in the presence of the juror, and counsel for defendants, so as not to antagonize him, acquiesced and he was permitted to go home for the night.

The second instance of separation occurred when a juror, named Hudgens, while walking through the corridors during a recess, said to a brother of one of counsel for defendants that "those sons of bitches owe me for automobiles and I'm going to see that they pay for it; old

Lucius [referring to defendant Dunham's counsel] didn't know that when he took me on the jury, but I'm going to see that they pay for it."

The trial judge was immediately told of these instances of separation of the prospective jury in a motion for a mistrial. He offered to permit counsel for both sides to cross examine the prospective juror who had gone home for the night and then determine whether any prejudice to defendants had resulted. This offer, however, was rejected, defendants contending that it would antagonize the prospective jurors and would further prejudice their cause. The judge then excused both the man who had gone home and the prospective juror who had made the prejudicial remarks.

Defendants insist that this was error; that in a felony case it is reversible error to deny a motion for a mistrial when a separation of the jury occurred, regardless of whether the jury had been sworn or whether any prejudice is shown. For this, they rely on *Wesley v. State,* 30 Tenn. 501 (1851) and *Wiley v. State,* 31 Tenn. 256 (1851).

In *Wesley v. State,* supra, a case of capital felony, eight of the jurors, empaneled the first day, were allowed to disperse by consent of the state and defendant; on the next day (Friday), two more were selected, and these ten, with like consent, dispersed until the following Monday when the jury was completed and the trial proceeded. This was held reversible error, requiring a new trial.

It was there held that the separation of the jury, unexplained, is, of itself, cause for a new trial; because, if the juror separating himself from his fellows, is placed

in a situation in which he might be tampered with, the court will not speculate as to whether any injury resulted to the prisoner, but will set aside the verdict.

In *Wiley v. State,* supra, the jury were permitted, by consent of the state's attorney and the prisoner, to separate from day to day. This was held reversible error and a new trial awarded; and the court said the principle that had been applied in Wesley to a capital case was equally applicable in any felony, whether capital or not.

The principle of those cases is that the separation of the jury, unexplained, placed the jurors in a situation where they might be tampered with; therefore, such separation vitiated their verdict in a felony case. We think those cases are distinguishable from the case before us and that that principle does not apply to this case.

As we have seen, separation of the two jurors in this case occurred before the jury was selected and sworn; and these two jurors, Harris and Hudgens, were excused from the jury by the judge. The judge questioned the other jurors, and they stated that none of them had separated from the jury and no one had talked to them. The number thus questioned by the judge included juror Roberts, who was alleged to have separated from the jury and to have been seen speaking to a woman in the courthouse near the other jurors; but he stated that he had not separated and no one talked to him. Thereupon, the jury was completed and the trial proceeded.

When the trial judge excused the two offending jurors and ascertained that the third had not separated from the jury, and that no one had talked to the other jurors, we think this removed any chance that there had been

any tampering with the jury and insured the integrity of the jury trial; and that this case is controlled by *Griffee v. State,* 69 Tenn. 41, and *Taylor v. State,* 79 Tenn. 708, 718-722, where it was held that the trial judge had a right to excuse the jurors who had separated, or the whole panel, or to excuse a juror who, after being selected, was shown by affidavits to be incompetent because he had formed and expressed an opinion.

So, we think the trial judge properly exercised his discretion to correct the matter of the separation of the jurors when the motion for a mistrial was made; and that no harm or prejudice resulted to defendants and the trial judge properly overruled their motion for a mistrial.

Finally, it is insisted by both defendants Fowler and Dunham that the trial judge erred in permitting the district attorney to cross-examine Dunham about his alleged crooked gambling activities; that these matters related to alleged independent crimes, were irrelevant to any issue on trial, and were so prejudicial to both defendants as to call for a reversal and a new trial.

The substance of the cross-examination complained of was that defendant Dunham was asked if his chief business and occupation for a number of years had not been that of a "professional crooked gambler," to which he replied: "No sir"; and if it were not true that among "big professional gamblers in many towns over the United States" defendant was well known as "a very crooked gambler," who, by "crooked and devious means usually beat everybody else out of their money," to which he replied: "No."

While proof of other independent crimes, not relevant to any issue on trial, is inadmissible, yet when

a defendant takes the stand as a witness for himself, he is subject to cross-examination like any other witness; and for the purpose of affecting his credibility, he may be asked as to specific acts which involve moral turpitude or any other misconduct which tends to show his lack of veracity or untrustworthiness. *Zanone v. State,* 97 Tenn. 101, 110, 36 S.W. 711; *Brooks v. State,* 187 Tenn. 67, 76, 77, 213 S.W.2d 7. 11; *Posley v. State,* 199 Tenn. 608, 288 S.W.2d 455; *Davis v. Wicker,* 206 Tenn. 403, 406-409, 333 S.W.2d 921.

 The trial judge has a wide latitude and a large discretion in the control of cross-examination of witnesses; and his exercise of such discretion will not be interfered with except in case of plain abuse of it. *Davis v. Wicker,* supra, 206 Tenn. 496, 333 S.W.2d 921. We think the matters asked on the cross-examination complained of were proper to test the credibility of defendant as a witness and that the trial judge did not abuse his discretion.

This disposes of all the material questions raised by the assignments of error and all of the assignments are overruled and the judgments are affirmed.