IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2003 Session

## STATE OF TENNESSEE v. ANTONIO HUNTSMAN

**Appeal from the Criminal Court for Shelby County**
**No. 00-14659     James C. Beasley, Jr., Judge**

**No. W2002-00708-CCA-R3-CD  - Filed July 25, 2003**

The defendant, Antonio Huntsman, was convicted of reckless homicide and the trial court ordered a sentence of three years and six months. In this appeal of right, the defendant asserts (1) that the trial court erroneously limited cross-examination of an eyewitness; (2) that the trial court allowed the admission of irrelevant evidence; (3) that the sentence was excessive; and (4) that he was erroneously denied some form of alternative sentencing. The judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Leslie I. Ballin, Memphis, Tennessee, for the appellant, Antonio Huntsman.

Paul G. Summers, Attorney General & Reporter; Braden H. Boucek, Assistant Attorney General; and Lee Coffee and Jerry Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In the early morning hours of November 14, 2000, the victim, Clayton Hicks, Jr., was shot and killed in Memphis. On the night before, the defendant and the victim, who was a police officer, were guests at the residence of Darrell Baldwin. Baldwin and his brother, Tracey, invited the victim, who was off-duty, and his brother to watch Monday Night Football. Later in the evening, the defendant arrived at the Baldwin residence accompanied by Steven Freeman, Nathaniel Sturdivant, and Morris Vaughn. Two women, Shannon Howard and Takelia Glover, were also present. Ms. Howard got into an argument with the victim after she recognized him as having previously investigated a domestic disturbance in which she was involved. At that point, the defendant and his three friends, who had been in another room playing video games, came in and began "arguing at" the victim. When the victim announced that he was "fixing to go" and made his way to the door, the defendant and the three other men attacked him from behind. According to Baldwin, the victim did not fight back, but was able to return to his vehicle and remove the police radio from the trunk.

Because the victim had left his hat inside the residence, Baldwin returned to the residence to retrieve it, closing and locking the door as he stepped back outside. He then looked up to see the victim moving toward the porch holding a pistol by his side in his right hand. At that point, Baldwin heard two or three shots and then saw the defendant, partially in the doorway and partially on the porch, with "large heavy artillery." Afterward, the victim lay in the yard.

Baldwin acknowledged that the victim had arrived at his residence with an open Heineken beer and two six-packs of the beverage. Because everyone present shared in the beer, it was consumed quickly and Baldwin and the victim went out to purchase another twelve-pack. Baldwin confirmed that the victim was agitated prior to the shooting and had used curse words in addressing Ms. Howard and the defendant.

Tracey Baldwin recalled that the victim had promised to take them all to jail as he stood at his car. Because he had an elderly uncle and did not want him to be disturbed, he asked the victim not to call for backup. He described the victim, who was angry, as charging towards the front door with his gun pointed downward when the shots were fired.

At the time of the shooting, Shannon Howard had been dating the defendant for five or six months. At trial, she testified that on the evening before the shooting, she was at the Baldwin residence drinking and playing cards when she recognized the victim as the police officer who had investigated a domestic disturbance between her and her aunt. She recalled that when the victim confirmed that he remembered her, they had a heated discussion about whether he could be trusted, the victim used the "f"word, and Sturdivant "rushed him." Ms. Howard contended that Freeman, Vaughn, and the defendant joined in the attack on the victim. She testified that no one was injured in the encounter and that the victim and his brother fled to the outside of the residence with the Baldwins. Ms. Howard stated that the defendant then went to a hallway closet and armed himself with a gun. She related that when the defendant opened the door to look out, he fired two or three shots at the victim, who was running towards them with a gun in his hand. Ms. Howard recalled that the defendant had yelled, "[D]on't come up on me," to the victim. Afterwards, the defendant left with Sturdivant, Freeman, and Vaughn.

Takelia Glover, who was dating Tracey Baldwin, testified that she had seen the gun used by the defendant some three days previously, when he brought it to the Baldwin residence. She was asleep in a back bedroom at the time of the shooting and was awakened by the sound of gunshots.

Steven Freeman confirmed that Ms. Howard and the victim had argued over the victim's work as a police officer and recalled that Ms. Howard had called the victim a "crooked-ass officer" and a "liar." He remembered the victim's using the "f" word and saying, "[Y]ou don't know me." He testified that when the defendant attempted to intervene on behalf of Ms. Howard, he and the victim pushed each other. Freeman recalled that when Vaughn and Sturdivant joined the scuffle, the victim left, saying, "All right. I'll be back." He testified that the defendant removed an AK-47 rifle from a closet and opened the front door before the victim rushed onto the porch with his gun by his side. He stated that when the victim was shot, he, Vaughn, Sturdivant, and the defendant drove to

his grandmother's residence nine or ten blocks away. While there, Vaughn removed the gun from the car and left it on the fence because the defendant refused "to mess with it." Freeman testified that the defendant instructed him to "lay low" and stated that he was going to Mexico. According to Freeman, he placed the gun in his grandmother's garage and surrendered himself to the police hours later.

Freeman acknowledged that he had initially lied to police, telling them that he had dropped the defendant off after the shooting rather than taking him to his grandmother's residence. He explained that he did so because he did not want his grandmother to be involved. Freeman described the victim as agitated just before the shooting.

Betty Jean Vaughn, Freeman's mother, testified that Freeman, Vaughn, and Sturdivant awakened her at approximately 4:30 a.m. on the morning of the shooting. She recalled that the defendant "walked the living room floor" for approximately fifteen minutes using his cellular telephone and that she directed Freeman to remove the gun from the property. Later, after speaking with Sergeant Fitzpatrick of the Memphis Police Department, Ms. Vaughn arranged for the return of the gun and surrendered it to police.

Officer Trent Swims of the Memphis Police Department, who was dispatched to the scene, found the unconscious victim lying in front of the house next door to the Baldwin residence. He was "facedown" with a gun in his right hand.

Danny Arquitt, a member of the Memphis Police Department crime scene unit, testified that there was a small amount of blood in the yard of the house next door to the Baldwin residence. None was found on the Baldwin porch or lawn area. A spent casing, a spent bullet, and a police radio were also found.

Memphis Police Sergeant James L. Fitzpatrick, the lead investigator, began searching for the defendant on the day following the shooting. He first contacted the defendant's mother, a deputy jailor, and then canvassed the defendant's neighborhood. After obtaining an unlawful flight warrant through the Safe Streets Task Force, an agency comprised of local, state, and federal law enforcement officers, he helped prepare a segment on the missing defendant for a national television show. The defendant surrendered on May 31, 2001, more than six months after the shooting.

The weapon used by the defendant was a Maadi semiautomatic rifle with a caliber of 7.62 by 39-millimeter and a folding stock for easy portability. Dr. Cynthia Gardner, who performed the autopsy, testified that while there was no evidence of marijuana in the victim's system, he had a blood alcohol level of .08 grams per deciliter and a urine alcohol level of .15 grams per deciliter. According to Dr. Gardner, a high velocity gunshot wound to the chest caused the victim's death. She testified that the bullet entered the victim's arm between the armpit and the elbow, exited three and one-half inches away, and then entered the chest, fracturing the fourth rib, damaging the left lung, and transecting the aorta. It was Dr. Gardner's opinion that the victim had been at least two feet or more away from the shooter.

The defendant, who was twenty-five years old at the time of trial, testified that he had known Tracey and Darrell Baldwin for years, having met Tracey in junior high school. A daily visitor to the Baldwin residence, he stated that he arrived at the residence sometime between 11:00 p.m. and midnight on the evening of the shooting accompanied by Freeman, Vaughn, and Sturdivant. He recalled that previously, he and the others had been drinking beer and watching football on television at his residence. According to the defendant, he did not know the victim or his brother, who were playing video games when he arrived. He stated that when the two men finished, he played video games for some time before hearing an argument elsewhere in the residence. He maintained that the victim was "pointing at everybody" and cursing. He testified that after the victim cursed at him, they struggled and fought before the victim stopped, saying, "[T]hat's all right. I'll be back. I'm fixing to get this pistol." He testified that he observed the defendant go to his vehicle and then run towards the residence before Darrell Baldwin shut and locked the door. The defendant maintained that the victim repeatedly struck the front door and demanded entry, using curse words as he did so. He stated that at that point, he took possession of the gun that he had previously left in a hallway closet. The defendant claimed that he shot the victim after he heard someone yell and looked up to see the victim running toward the door, pointing a gun in his direction.

The defendant contended that after the shooting, he was "like in [a] trance" until he heard someone yell out, "Come on, let's go," at which point he left in Freeman's vehicle. Later, he called a friend named Quisha Mims, who drove him by his residence to get some money. The defendant stated that he stayed at her residence for approximately two days and maintained that he did not turn himself in after the shooting because he had panicked upon seeing a television report that indicated that the victim was a Memphis Police officer. He contended that he was afraid of retribution from other law enforcement officers and that he "knew that there would be a cover-up." The defendant, who was aware that police were looking for him, testified that he went to Louisiana, Mississippi, and Georgia.

I

Initially, the defendant argues that the trial court erred by restricting his cross-examination of Tracey Baldwin. The state contends that the contested testimony was impermissible and irrelevant and that if there was any error, it was harmless.

Denial of the right to effectively cross-examine is "'constitutional error of the first magnitude'" and amounts to the denial of a basic right essential to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308 (1974)). While the right is fundamental, propriety, scope, and control of cross-examination is left to the sound discretion of the trial judge. Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts cannot interfere with the exercise of that discretion absent a clear and plain abuse. See State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460, 464 (1963); Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948).

During Baldwin's cross-examination by the defense, the following exchange took place:

-4-

Q       At the time that he was running toward [the defendant], did you think that [the victim] was going to shoot [the defendant]?

[STATE]:            Object, Your Honor.  Calls for a conclusion.
THE COURT:       Sustained.
[DEFENSE]:        I'm asking what [this witness] thought, Your Honor.
                 . . .
              *        *        *
THE COURT:       I'll allow him to testify to what . . . he thought.

Baldwin then testified that although he did not know whether the victim intended to shoot the defendant, that was his impression.  Later, the trial court reconsidered the issue and reversed itself, concluding that the proffered testimony was irrelevant:

I'm going to reverse my ruling . . . .  I don't think it's relevant or proper what [Baldwin] thought. . . .
              *        *        *
I have no problem with [Baldwin] or any other witness testifying to what they saw or what they observed as to what the activities of [the victim] and [the defendant] were.  But the question of whether . . . [the defendant's] actions [in self-defense] were reasonable is a question for this jury to determine and not a question for [] Baldwin to determine . . . .

At the state's request, the trial court provided a curative instruction that the jury was to disregard Baldwin's testimony on the issue.

In our view, the trial court did not err by excluding Tracey Baldwin's testimony as to whether the victim intended to shoot the defendant.  At trial, the defendant contended that he acted in self-defense.  The defense requires "a reasonable belief that there is an imminent danger of death or serious bodily injury.  The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(a).  Thus, subjective impressions about the level of danger, even those of the defendant, are far less important than the facts and circumstances surrounding the shooting. See Tenn. R. Evid. 401, 402; State v. Bult, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998).  Baldwin and other witnesses were allowed to testify in great detail as to the circumstances, including the victim's attitude, demeanor, and actions.  The jury had sufficient information to evaluate the defendant's claim of self-defense, i.e., and whether a reasonable person in the defendant's position would have believed himself to be in imminent danger of death or serious bodily injury.  Thus, there was no error.

II

The defendant next contends that the trial court erred by allowing Sergeant Fitzpatrick to testify that he assisted with a national television program in an effort to apprehend the defendant. He asserts that such testimony was irrelevant and that its probative value was substantially

outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 402, 403. The state responds that the testimony constituted evidence of flight by the defendant that was relevant and indicative of guilt.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it otherwise would be. Tenn. R. Evid. 401. Generally, all relevant evidence is admissible. Tenn. R. Evid. 402. At the discretion of the trial court, however, relevant evidence may be excluded if it presents a danger of unfair prejudice:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. This court must not reverse the trial court on an issue such as this absent an abuse of discretion. See State v. Stout, 46 S.W.3d 689, 700 (Tenn. 2001).

In Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979), this court quoted 29 Am. Jur. Evidence § 280 at 329 on the issue of flight:

> "The fact that a defendant after the commission of a crime concealed himself or fled from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt."

Earlier, in Rogers v. State, 2 Tenn. Crim. App. 491, 455 S.W.2d 182, 187 (1970), this court adopted the view set out in 22A C.J.S. Criminal Law § 625:

> "The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

It is our conclusion that the defendant's efforts to avoid capture are admissible circumstantial evidence tending to indicate guilt. See Tenn. R. Evid. 401, 402; Hall, 584 S.W.2d at 821. The evidence at trial showed that immediately after the shooting, the defendant left the scene and disposed of the weapon. He telephoned a girlfriend to provide transportation, took possession of a large sum of money from his residence, and then remained hidden at his girlfriend's residence for several days. The defendant avoided arrest for six and one-half months. That a nationwide television broadcast was utilized to assist in his capture was relevant to show the extensiveness of police efforts to locate the defendant. The trial court did not abuse its discretion by admitting Sergeant Fitzpatrick's testimony.

III

Finally, the defendant argues that his sentence is excessive and that the trial court erred by ordering a sentence of incarceration. The state asserts that the trial court's determinations are supported by the record and that the sentence should be affirmed.

At the sentencing hearing, the victim's mother testified that the victim had wanted to be a police officer since he was a child and that he had been with the Chattanooga Police Department for three years, including his time spent training in the police academy. She also stated that he had had some Air Force training.

Speaking indirectly to the victim's family, the defendant testified that he "was sorry for [his] part in the tragedy." He stated that he no longer intended to be involved with weapons and that he had possessed the gun involved in the shooting for self-protection. According to the defendant, he had arranged for a job with MCI upon release, intended to live with his mother, who was a deputy jailer, and planned on enrolling in the University of Memphis. During cross-examination, he acknowledged that he had been convicted for possession of marijuana in 1995 and that he had engaged in selling drugs during that time period. The defendant also acknowledged 1996 and 1998 convictions for weapons offenses, both of which involved handguns, and one of which resulted in a probationary sentence. He estimated that he had owned four guns in his lifetime and admitted that he had carried them on his person and in his vehicles. The defendant contended that he left the scene of the shooting before police could arrive because he "was just in a state of shock that somebody got shot. That [he] shot somebody."

Gregory Huntsman, the defendant's uncle and an officer with the Houston Police Department for approximately nineteen years, testified that he had spoken with the defendant and that it was his opinion that the defendant was "sincerely sorry" and would not have any further involvement with guns. He stated that he believed the defendant to be capable of successfully completing a sentence of probation and that there would be ample family support.

The presentence report revealed that the defendant, who had two minor daughters, had provided the reporting officer with the following statement concerning the offense:

> I just wanted to state that I wish I could take that night of the tragedy back. . . . The Lord knows I only acted in self defense cause I'm not that type of person. I hope that you see fit to help me and give me a chance to prove my character and grant me this probation. I have a family with kids that I cherish to my heart. I would like to be able to get back to them. And I also would like the chance to prove doubts of me wrong. If you see fit for me to have another chance, th[e]n you won't be disappointed! . . . Just see in your heart to give me . . . a try. I can uphold any kind of stipulations to the probation, including any kind of classes. My kids are my life and most of all, now, God is all I live for! . . .

The defendant had not been employed in the last six years. The report did not include any work history.

The trial court found three enhancement factors: (1) that the defendant had a previous history of criminal convictions or behavior in addition to that necessary to establish the appropriate range; (9) the defendant possessed or employed a firearm during the commission of the offense; and (10) that the defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(1), (9), (10). As mitigating factors, the trial court found that the defendant acted under strong provocation and that substantial grounds existed tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense. See Tenn. Code Ann. § 40-35-113(2), (3). The trial judge placed great weight on the defendant's "consistent pattern of possessing firearms " and two prior weapons convictions, stating that "had [the defendant] not possessed a firearm . . . a death would not have occurred." It also placed great emphasis on the defendant's possession of a firearm during the commission of the offense, citing the nature of the weapon used by the defendant as something "high powered," "dangerous," and appropriate for use by the military. Finding that the enhancement factors outweighed the mitigating factors, the trial court ordered a Range I sentence of three years and six months.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class B, C, D, or E felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-

210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

In this appeal, the defendant does not contest the applicability of the enhancement and mitigating factors found by the trial court, but instead contends that the factors were assigned disproportional weight. The only argument he submits, however, is that, "[w]hile an equal number of enhancement and mitigating factors were applied, the sentence is within six months of the maximum for a [R]ange I offender convicted of [r]eckless [h]omicide." In our view, the trial court properly weighed the enhancement and mitigating factors that it considered. The defendant, although only twenty-five years of age at the time of the shooting, had a significant history of firearms usage, including two prior weapons convictions. He had left the gun used in the shooting at the Baldwin residence because he spent so much time there. The result was the death of a police officer. In our view, the trial court did not abuse its discretion.

The defendant also contends that the trial court erred by denying him an alternative sentence. He argues that the death of the victim is not sufficient to overcome the presumption in favor of alternative sentencing and points out that his criminal history consisted only of misdemeanors.

In denying the defendant's request for probation, the trial court found that the defendant had poor potential for rehabilitation and that confinement was necessary to avoid depreciating the seriousness of the offense. Specifically, it cited the defendant's role in escalating the situation leading up to the shooting, his failure to work or attend school for the past five to six years, and his having been granted two previous probationary sentences.

Especially mitigated or standard offenders convicted of Class C, D, or E felonies are, of course, presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, none of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(b) (Supp. 2000).

Among the factors applicable to probation consideration are the circumstances of the offense, the defendant's criminal record, social history and present condition, and the deterrent effect upon and best interest of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978). The nature and circumstances of the offenses may often be so egregious as to preclude the grant of probation. See State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981). A lack of candor may also militate against a grant of probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983).

The purpose of the Community Corrections Act of 1985 was to provide an alternative means of punishment for "selected, nonviolent felony offenders in front-end community based alternatives to incarceration." Tenn. Code Ann. § 40-36-103. The community corrections sentence provides a desired degree of flexibility that may be both beneficial to the defendant yet serve legitimate societal aims. State v. Griffith, 787 S.W.2d 340, 342 (Tenn. 1990). Even in cases where the defendant meets the minimum requirements of the Community Corrections Act of 1985, the defendant is not

necessarily entitled to be sentenced under the Act as a matter of law or right. State v. Taylor, 744 S.W.2d 919 (Tenn. Crim. App.1987). The following offenders are eligible for community corrections:

> (1) Persons who, without this option, would be incarcerated in a correctional institution;
> (2) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
> (3) Persons who are convicted of nonviolent felony offenses;
> (4) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
> (5) Persons who do not demonstrate a present or past pattern of behavior indicating violence;
> (6) Persons who do not demonstrate a pattern of committing violent offenses; and
> Persons who are sentenced to incarceration or on escape at the time of consideration will not be eligible.

Tenn. Code Ann. § 40-36-106(a).

Moreover, in Ashby, our supreme court encouraged the grant of considerable discretionary authority to our trial courts in matters such as these. 823 S.W.2d at 171. See State v. Moss, 727 S.W.2d 229, 235 (Tenn.1986). "[E]ach case must be bottomed upon its own facts." Taylor, 744 S.W.2d at 922. "It is not the policy or purpose of this court to place trial judges in a judicial straight-jacket in this or any other area, and we are always reluctant to interfere with their traditional discretionary powers." Ashby, 823 S.W.2d at 171.

The trial court did not err by ordering a sentence of incarceration. Because the defendant was convicted of a violent felony offense involving the possession and use of a weapon and has failed to show "special needs" eligibility, he is not eligible for a community corrections sentence. See Tenn. Code Ann. § 40-36-106(a)(3), (4). Although he would qualify for a presumptive sentence of probation, the evidence in the record supports the trial court's determination that the defendant exhibited little potential for rehabilitation. In spite of two prior weapons offenses and two prior sentences of probation, the defendant has continued to utilize weapons and, in this case, he had no hesitation about resorting to the use of a high velocity, semi-automatic, assault rifle. His employment record is non-existent. In our view, incarceration is necessary to avoid depreciating the seriousness of the offense. The defendant displayed a semiautomatic weapon to a man he knew to be a police officer. The results were fatal.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE