IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 1, 2015

## STATE OF TENNESSEE v. TIMOTHY CURTIS GREENMAN

**Appeal from the Circuit Court for Tipton County**
**No. 7829    Joseph H. Walker, Judge**

---

**No. W2014-02300-CCA-R3-CD  -  Filed October 9, 2015**

---

The defendant, Timothy Curtis Greenman, appeals his Tipton County Circuit Court jury convictions of aggravated robbery, aggravated burglary, and facilitation of burglary of a motor vehicle, claiming that the evidence was insufficient to support his convictions and that the trial court erred by admitting certain evidence at trial.  Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROGER A. PAGE and TIMOTHY L. EASTER, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Timothy Curtis Greenman.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Jason R. Poyner and James Walter Freeland, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In November 2013, the Tipton County Circuit Court grand jury charged the defendant with one count each of burglary of a motor vehicle, aggravated burglary, and aggravated robbery arising out of the home invasion of Larry and Bernadine Alley.  The trial court conducted a jury trial in August 2014.

The State's proof at trial showed that the Alleys, both of whom were in their early 80s, lived in a residence at the corner of Duncan Drive and Elizabeth Drive in Atoka.  From the Alleys' residence, Duncan Drive runs generally in an easterly direction, where, after roughly six-tenths of a mile, it intersects with Rosemark Road.

Approximately three-tenths of a mile south of the Duncan/Rosemark intersection, Persimmon Cove runs to the west and Hawthorn Lane runs to the east.

On the morning of July 2, 2013, Mr. Alley, after chipping golf balls in his back yard, reentered his house at approximately 10:00 a.m.; he left the garage door up and the entry door from the garage to the kitchen unlocked. Inside the garage were the Alleys' two vehicles: a Jeep Liberty and a pickup truck. The Jeep's doors were closed but unlocked.

Mr. and Mrs. Alley were seated in their living room and had just begun watching a movie on television when Mr. Alley suddenly found himself face down on the floor. Mr. Alley felt someone's hand holding him down by the back of his neck, and his assailant, later identified as the defendant, instructed him not to move, tapping Mr. Alley's right temple with a hammer. When Mr. Alley attempted to lift his head, the defendant stated, "'Don't move or I'll bloody your f***ing head all over this f***ing carpet.'" The defendant then instructed his accomplice, later identified as Devin Austill, to "'[g]et the money, get the drugs.'"

Mr. Austill accompanied Mrs. Alley into the master bedroom, and she gave him over $300 in cash. In the meantime, the defendant continued to hold Mr. Alley's neck against the floor while threatening him. The Alleys both testified that the defendant was in charge and that Mr. Austill followed the defendant's directives. Although Mr. Alley was unable to see the defendant, he was able to notice Mr. Austill's shoes as Mr. Austill was walking to the bedroom. Mr. Alley described the "Nike" athletic shoes as "red and white and black." Mr. Alley initially described the assailants to law enforcement officers as "two males black" because the defendant was "talking like a black man." Mr. Alley stated, however, that the accent sounded "put on" and that he knew "it was not real." Both the defendant and Mr. Austill had tied bandanas around their heads to obscure their faces. Mrs. Alley testified that the defendant "sounded very black" because he was using "street talk slang" and that the defendant's hair was black. Mr. Alley testified that the defendant was "directing" Mr. Austill and that Mr. Austill was "following orders" from the defendant.

When Mr. Austill returned to the living room with the cash, the defendant instructed him to "[g]et the drugs." The Alleys explained that the only medication they had was Mrs. Alley's blood pressure medication and that the medication could prove fatal to the assailants. The defendant abandoned the notion of the drugs and directed Mr. Austill to rip the telephone line out of the wall. Although Mrs. Alley pointed out the location of her cellular telephone, the assailants did not take it. The defendant and Mr. Austill then fled from the house.

- 2 -

Mr. Alley ran outside but saw no one. Before he reentered his house, he noticed that the driver's door of the Jeep Liberty was open and that "materials [were] scattered" on the ground near the open door. The only items missing from the Alleys' residence and vehicle were the cash and Mrs. Alley's asthma inhaler.

Officer Rex Allen Wallace with the Town of Atoka Code Enforcement heard the report of a home invasion by "[t]wo black subjects" on his police scanner at approximately 10:15 a.m. on July 2. At approximately 11:00 a.m., Officer Wallace was parked at the corner of Persimmon Cove and Hawthorn Lane when he noticed two white males walking southbound on Rosemark Road. As Officer Wallace observed the two men for "[a]t least two minutes," the men crossed through the intersection and proceeded to walk down Persimmon Cove. The two men caught the eye of Officer Wallace because they were wearing "camouflage shorts, no shirts, one wearing a backpack," and one carrying a rifle. Officer Wallace identified the defendant as the man he saw carrying the backpack.

Later that evening, Officer Wallace encountered a policeman and asked whether officers had captured the suspects involved in the home invasion. When the officer responded that they had "got a young white male," Officer Wallace asked if it "happen[ed] to be on Persimmon Cove." The police officer responded in the affirmative and told Officer Wallace to come to the police station the following day to make a statement.

Investigator Dan Jones with the Atoka Police Department responded to the call of the Alleys' home invasion on July 2. At approximately 2:00 p.m., Investigator Jones was notified that officers had located a person of interest, and he proceeded to an apartment complex where he encountered Mr. Austill and Mr. Austill's father. Mr. Austill was wearing dark shorts and a t-shirt, and, after obtaining consent to search the apartment, Investigator Jones recovered a black backpack and a pair of black, red, and white Nike athletic shoes. After taking a statement from Mr. Austill, Investigator Jones considered the defendant a suspect. Investigator Jones also met with Officer Wallace and presented him with a photographic lineup, from which Officer Wallace positively identified the defendant as one of the two men he saw walking on Rosemark Road on the morning of July 2.

Investigator Jones used confidential informant Taylor McPeak, who also happened to be related to Mr. Austill, to arrange a meeting with the defendant on July 4 at the Atoka Car Wash. Investigator Jones wired Mr. McPeak with a special wristwatch which recorded both audio and video and which was monitored by Investigator Jones,

who was stationed nearby. A digital video disc of the recording was admitted into evidence and played for the jury. Although the clarity of both the audio and video was poor, certain phrases and sentences were clear, and the defendant was clearly visible on the recording on several occasions. On the recording, Mr. McPeak made several attempts to get the defendant to speak about the home invasion. At roughly 18:44:20 on the video, the defendant began speaking very softly. Over the course of the next 30 seconds, the defendant continued his explanation, and at 18:44:50, the defendant could be heard animatedly describing a series of events, using the phrases "didn't hear me coming in," "get down like this" and, still speaking softly but emulating a shout, "I'm gonna spill your blood on the floor." Mr. McPeak responded, "And what did his wife say?" A few seconds later, the defendant, laughing while describing his getaway with Mr. Austill, stated that Mr. Austill needed "to work on his conditioning" as they fled on foot.

Mr. McPeak then asked, "How did y'all get away from the police? How many did you see?" The defendant responded that they "seen one on a motorcycle and one that we seen fly by, but we heard 'em all around." Mr. McPeak asked how they managed to get away, and the defendant answered that they "didn't stay on the road." Mr. McPeak then inquired if they were laughing during their escape, and the defendant stated that he was not and that he "was panicking." Mr. McPeak asked if the defendant was nervous at the time, and the defendant emphatically responded, "Hell, yeah."

At approximately 18:53:01, Mr. McPeak asked the defendant, "What did the old man do when you let him go?" The defendant's response was unintelligible, but then Mr. McPeak asked the defendant, "Did you jerk him out of his chair?" The defendant appeared to respond that the man "had just sat down" and that he "grabbed him," though the rest of his response was unintelligible. Mr. McPeak asked the defendant, "What did he say when you put that hammer up to him?" Once again, the defendant's response was unintelligible. Mr. McPeak asked how long the defendant and Mr. Austill were inside the house, and the defendant responded, "Maybe five minutes."

Investigator Jones confirmed that a "motorcycle cop . . . flew by the [Alleys'] house" after the call of the home invasion came in and that officers were "in hot pursuit" that morning. Investigator Jones's search of the defendant's residence on July 4 revealed a BB rifle, and he arrested the defendant on July 4 in connection with the Alleys' home invasion.

Mr. Austill testified that he had previously pleaded guilty to facilitation of aggravated robbery, aggravated burglary, and burglary of a vehicle arising out of his involvement in the Alleys' home invasion and that he had already been sentenced following his guilty plea. According to Mr. Austill, he went to the defendant's residence

- 4 -

at 3:00 a.m. on July 2, where the two "talked and played games and stuff." At some point, the defendant and Mr. Austill left the defendant's house and "walk[ed] around the neighborhood." Mr. Austill identified a photograph of Nike athletic shoes that were recovered from his home, and he confirmed that those were the shoes he was wearing on July 2. Mr. Austill stated that he was wearing shorts but no shirt and that he was carrying the black backpack that authorities had recovered from his house.

Mr. Austill stated that he and the defendant entered an open garage in the neighborhood and stole a global positioning system ("GPS") unit from one of the cars in the garage. After concealing their faces behind bandanas, the defendant entered the house "through a door from the garage," followed closely by Mr. Austill. Mr. Austill saw the defendant "put [Mr. Alley] on the ground with a hammer." Mr. Austill testified that the defendant had retrieved the hammer from the Alleys' garage before entering the house. Per the defendant's instructions, Mr. Austill followed Mrs. Alley into her bedroom and took "a couple hundred dollars" in cash from her. Mr. Austill overheard the defendant threaten Mr. Alley by saying, "'Don't move or I'll draw blood.'" After leaving the Alleys' residence, the defendant and Mr. Austill divided the money that they had stolen, and they walked back to the defendant's residence by proceeding "through some back yards and stuff."

With this evidence, the State rested. Following the denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant elected not to testify and chose not to present any proof.

Based on this evidence, the jury convicted the defendant as charged of aggravated robbery and aggravated burglary and the lesser included offense of facilitation of burglary of a motor vehicle. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of eight years' incarceration to be served at 85 percent by operation of law for the aggravated robbery conviction and three years' incarceration to be served at 30 percent for the aggravated burglary conviction. With respect to the conviction of facilitation of burglary of a motor vehicle, the trial court imposed a sentence of 11 months and 29 days. The court ordered all sentences to be served concurrently for a total effective sentence of eight years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence is insufficient to support his convictions and that the trial court erred by admitting the video recording into evidence without proper authentication. We will address both issues in turn.

*I. Sufficiency*

The defendant contends that the evidence is insufficient to support his convictions of aggravated robbery, aggravated burglary, and facilitation of burglary of a motor vehicle. Specifically, the defendant argues that the testimony of Mr. Austill was not properly corroborated. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and

legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

"A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony . . . or . . . [e]nters any . . . passenger car, automobile, . . . or other motor vehicle with intent to commit a felony [or] theft . . . ." *Id.* § 39-14-402(a)(1), (4). Aggravated burglary is "burglary of a habitation." *Id.* § 39-14-403(a).

Moreover, "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a).

In the instant case, the proof at trial established that two men entered the Alley residence at approximately 10:00 a.m. on July 2, 2013, without the Alleys' effective consent and with the intent to rob the homeowners. The man who attacked Mr. Alley held a hammer against his temple and threatened to "bloody [his] f***ing head all over this f***ing carpet" if Mr. Alley moved. The same man instructed his accomplice to get money and drugs from Mrs. Alley, and Mrs. Alley complied with the request for cash, giving the accomplice over $300. Mr. Alley clearly saw the red, black, and white athletic shoes that the accomplice was wearing, and, although he believed the assailants to be black, he testified that he was unable to see their faces and that their speech patterns seemed "put on" or fake. Mr. Alley's attacker held him on the floor throughout the home invasion and kept the hammer pressed against his head. After the assailants fled with the

Alleys' money, Mr. Alley ran into his garage and noticed that the door of his Jeep Liberty was open and that "materials [were] scattered" on the ground near the open door.

At approximately 11:00 a.m., Officer Wallace saw two white males walking southbound on Rosemark Road, which is approximately three-quarters of a mile from the Alley residence as the crow flies. Officer Wallace observed that both men were shirtless, wore camouflage shorts, and one man carried a black backpack while the other carried a rifle. The two men crossed through the intersection of Rosemark Road and Persimmon Cove and proceeded down the dead-end street of Persimmon Cove. Later that evening, Officer Wallace positively identified the man he saw carrying the backpack as the defendant.

Investigator Jones learned on July 2 that Mr. Austill was a "person of interest" in the home invasion, and, after speaking with Mr. Austill and conducting a search of his residence, Investigator Jones recovered a black backpack and a pair of black, red, and white Nike athletic shoes. After taking a statement from Mr. Austill, Investigator Jones arranged for Mr. Austill's relative, Mr. McPeak, to act as a confidential informant during a planned interaction with the defendant. Wired with a wristwatch recording device, Mr. McPeak met the defendant on July 4 and spoke with him about the home invasion. During the course of the recording, the defendant can be heard describing a series of events, using the phrases "didn't hear me coming in," "get down like this" and, still speaking softly but pretending to shout, "I'm gonna spill your blood on the floor," to which Mr. McPeak responded, "And what did his wife say?" Mr. McPeak also asked the defendant whether he had "jerk[ed] [Mr. Alley] out of his chair, and the defendant appeared to respond that Mr. Alley "had just sat down" and that he "grabbed him." Mr. McPeak also asked what Mr. Alley had said when the defendant "put that hammer up to him." When Mr. McPeak asked the defendant how long he and Mr. Austill were inside the house, the defendant responded, "Maybe five minutes." When Investigator Jones searched the defendant's residence on July 4, he recovered a BB rifle.

Mr. Austill testified that he and the defendant entered an open garage in the defendant's neighborhood and stole a GPS unit from one of the cars in the garage. The two men concealed their faces, entered the house through the garage, and Mr. Austill witnessed the defendant "put [Mr. Alley] on the ground with a hammer" which the defendant had retrieved from the Alley's garage before entering the house. At the defendant's behest, Mr. Austill took cash from Mrs. Alley, and the defendant and Mr. Austill later divided the money. The two men returned to the defendant's house on Persimmon Cove by proceeding "through some back yards and stuff."

- 8 -

Taking all of this evidence into consideration, we find that the evidence supports the defendant's convictions of aggravated robbery, aggravated burglary, and facilitation of burglary of a motor vehicle. The defendant robbed the Alleys by forcing Mr. Alley onto the floor and threatening to "bloody" his head with a hammer, a deadly weapon, while his accomplice stole over $300 from Mrs. Alley. *See* T.C.A. § 39-13-402. The defendant entered the Alley residence without the Alleys' consent and with the intent to commit a robbery. *See* T.C.A. § 39-14-403(a). After the defendant and Mr. Austill fled from his house, Mr. Alley discovered that one of the doors of his Jeep Liberty automobile was open and that materials from inside the vehicle were scattered on the ground next to the door. Although no one other than Mr. Austill testified that a GPS unit had been stolen from the motor vehicle, the facts that, after the defendant left the Alley residence, the door of the vehicle was open and the contents of the vehicle had been disturbed were sufficient to establish that the defendant facilitated Mr. Austill's burglary of the vehicle. The defendant's own video-recorded statements along with the testimony of the Alleys, Officer Wallace, and Investigator Jones were enough to corroborate the testimony of Mr. Austill and "connect the defendant with the commission of the crime[s] charged." *Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803). Viewing this evidence in the light most favorable to the prosecution, we find the evidence adduced at trial sufficiently established the defendant's convictions of aggravated robbery, aggravated burglary, and facilitation of burglary of a motor vehicle.

## *II. Authentication of Video Recording*

The defendant argues that the trial court erred by admitting into evidence the digital video disc containing the recording of the defendant's July 4, 2013 interaction with Mr. McPeak. The defendant claims that the only witness qualified to authenticate the recording was the confidential informant, Mr. McPeak, who did not testify. The defendant relies on Tennessee Rule of Evidence 901(b)(1), alleging that Investigator Jones did not have sufficient knowledge of the recording to authenticate it.

Authentication of evidence is governed by Tennessee Rule of Evidence 901, which provides in pertinent part as follows:

> (a) General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.

(b) Illustrations.  By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) *Testimony of Witness With Knowledge*.  Testimony that a matter is what it is claimed to be.

Tenn. R. Evid. 901(a), (b)(1).

Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, accordingly, the court's ruling will not be disturbed absent a showing that the court clearly abused its discretion.  *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining."  *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d. 319, 337 (Tenn. 2006)); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Our supreme court has held that recordings "are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversation and was in a position to identify the declarant with certainty." *State v. Walker*, 910 S.W.2d 381, 394-95 (Tenn. 1995); *see also State v. Bobby Lewis Smith*, No. M2010-02077-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Nashville, Aug. 31, 2012), *perm. app. denied* (Tenn. Mar. 21, 2013).  In *State v. Kerry Lee Chearis, a/k/a Karry Cheairs and "Rabbit,"* this court was presented with the same issue as the one at bar, involving authentication of a video recording.  *Kerry Lee Chearis*, No. W2007-01850-CCA-R3-CD (Tenn. Crim. App., Jackson, Aug. 11, 2008), *perm. app. denied* (Tenn. Jan. 20, 2009).  The defendant in *Kerry Lee Chearis* argued that a video recording made by confidential informants during a narcotics transaction was not properly authenticated because "the only persons qualified to authenticate the recordings were the confidential informants, who did not testify."  *Id.*, slip op. at 5-6.  This court disagreed, finding that the investigators testified at trial "that they helped set up the video equipment, visually observed the purchases from another vantage point, and retrieved the tapes immediately following the purchases" and held that this testimony "was sufficient to satisfy the authentication requirement."  *Id.*, slip op. at 6.

In the instant case, Investigator Jones testified that he placed the wired wristwatch on Mr. McPeak while standing in the Atoka Elementary School parking lot on

the afternoon of July 4, 2013. Investigator Jones can be seen and heard speaking to Mr. McPeak at the beginning of the recording. Investigator Jones and another officer followed Mr. McPeak in a separate vehicle from the school parking lot to a convenience store. Although the investigators were unable to see Mr. McPeak and the defendant while they were inside the convenience store, they were only out of sight for a brief period of time, and then the investigators followed the men to the outdoor car wash where most of the conversation between Mr. McPeak and the defendant took place while standing outside Mr. McPeak's vehicle. After Mr. McPeak and the defendant drove away from the car wash, the officers followed them to the defendant's house. The defendant went inside his house, and the officers followed Mr. McPeak back to the elementary school where Investigator Jones retrieved the wristwatch from Mr. McPeak and stopped the recording. Investigator Jones then transferred the recording from the wristwatch onto a digital video disc via his office computer.

In our view, the actions of Investigator Jones – and his testimony thereto – in personally equipping Mr. McPeak with the recording device, following and observing Mr. McPeak and the defendant throughout the recorded incident, and retrieving the device from Mr. McPeak immediately after the incident was certainly sufficient to satisfy the requirements for authentication under Rule 901. Although the defendant advances the theory that Investigator Jones's failure to "continuously observe" Mr. McPeak and the defendant throughout the recording process differentiates the instant case from the facts of *Kerry Lee Chearis*, no such requirement of continuous observation exists. At any rate, the brief time period in which the men were out of sight inside the convenience store was not enough to negate Investigator Jones's observation. As such, the trial court committed no abuse of discretion.

Within his argument on the issue of authentication, the defendant makes passing references to the video recording as inadmissible hearsay and irrelevant evidence. "Review generally will extend only to those issues presented for review." Tenn. R. App. P. 13(b). Because the references to hearsay and relevancy are beyond the scope of the defendant's issue on authentication, we need not consider them any further.

*Conclusion*

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE