IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 18, 2016 Session

**STATE OF TENNESSEE v. ANDREW LORENZE ALLEN**

**Appeal from the Criminal Court for Washington County**
**No. 39005A    Lisa N. Rice, Judge**

---

**No. E2015-01778-CCA-R3-CD – Filed August 1, 2016**

---

The defendant, Andrew Lorenze Allen, appeals his Washington County Criminal Court jury convictions of aggravated child abuse and aggravated child neglect, claiming that the evidence was insufficient to support his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

James T. Bowman, Johnson City, Tennessee (on appeal and at trial); and Nikki Himebaugh, Johnson City, Tennessee (at trial), for the appellant, Andrew Lorenze Allen.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Tony Clark, District Attorney General; and Erin McArdle and Justin Irick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In September 2013, the Washington County Grand Jury charged the defendant, along with Amanda Percell, with alternate counts of aggravated child abuse and alternate counts of aggravated child neglect, stemming from injuries sustained by Ms. Percell's two-year-old son. In December 2014, the trial court conducted a jury trial in which the defendant was tried separately from Ms. Percell.

The State's proof at trial showed that on Wednesday, May 15, 2013, at 11:02 a.m., Deputy John Forrester with the Washington County Sheriff's Department ("WCSD") responded to a call of reported head injuries to a small child at 533 Browning Road. When Deputy Forrester arrived at the mobile home residence, he saw a woman standing on the front porch holding the victim, and Deputy Forrester immediately noticed

that the victim's head "was swollen to about three times" its normal size.  The victim's eyes were swollen shut, and he was crying as if he were "in a lot of pain."  Supervising paramedic Michael Cook with the Washington County/Johnson City Emergency Medical Service ("WC/JCEMS") arrived at the scene contemporaneously with Deputy Forrester and began working on the victim who had "obvious injuries to him, significant swelling to his face, bruising to his eyes."

The victim's mother, later identified as Amanda Percell, told Mr. Cook that the victim had "fallen off the back porch . . . a couple hours prior to the call."  Mr. Cook described the victim as "lethargic" and in "an altered level of consciousness, not crying, fairly calm."  With respect to the victim's injuries, Mr. Cook testified that his right eye "was almost swollen shut" and that he had "real significant swelling to the face."  Deputy Forrester described the victim's face as "so swollen you couldn't tell where his eyes were supposed to be and where his mouth was supposed to be."  Mr. Cook also observed bruising on the victim's arms and legs that were "different colored bruising, some blue-greens, and purple colors," which he believed to be older bruises.  Mr. Cook was "fearful that [the victim] wasn't going to survive" his injuries.  Deputy Forrester noticed bruising on the victim's legs and lower back as well.

The defendant, later identified as Ms. Percell's boyfriend, was not present at the residence when Deputy Forrester and Mr. Cook arrived.  Later, while Deputy Forrester was taking measurements at the scene, the defendant drove up to the scene with an infant, later identified as the defendant's and Ms. Percell's child, and entered the residence.  A WCSD investigator then took a statement from the defendant.  Meanwhile, Deputy Forrester measured the back porch of the mobile home, which was approximately six to seven feet above the ground with "six or eight steps" leading to the ground, which was covered with grass.

On cross-examination, Deputy Forrester confirmed that the victim and his mother were the only persons present at the scene when he arrived, but he could not remember whether a vehicle was outside the residence.

When WC/JCEMS Paramedic Robert Watson, Jr., arrived at the scene, he observed Mr. Cook holding the victim.  Mr. Watson testified that the victim appeared to be dirty, as if "he hadn't had a bath in two or three days" and noticed that the victim's fingernails were very long and dirty.  Mr. Watson did not observe any grass stains on the victim.

Mr. Watson immediately took note of the extent of the victim's injuries, testifying that the victim was bruised "from basically his head to his feet."  The victim's right eye was swollen shut, and he had "battle signs behind his ears," which Mr. Cook

explained were bruises behind the ears that typically indicated a "basilar skull fracture." Mr. Cook also noticed a large bruise on the center of the victim's back that appeared to be a few days old due to its yellow-green coloring, and he observed fresher bruises on the victim's arms. Mr. Cook opined that this was "probably the wors[t] child abuse case that [he had] ever worked."

Forensic nurse Tessa Proffitt testified as an expert in the field of forensic nursing. On May 15, the pediatric emergency department at the Johnson City Medical Center contacted Ms. Proffitt and requested her services in the examination of the victim. Ms. Proffitt described the victim's injuries as follows:

> [H]is right eye was swollen shut. He had extensive bruising to his forehead extending to the right side down his ear, around to the back side of his head in his hairline. He had several patterned injuries. And a patterned injury is an impression of an item that was used. He had several – he had one on his right lower back. He also had one in the center of his upper back in between his shoulder blades. He had bruising to the backs of his hands. These bruises were in different stages of healing. Some of them were purple and red. Some of them were kind of green, yellow and brown, so they didn't happen at the same time. And he also had a few bruises to his legs as well.

Through Ms. Proffitt's testimony, the State introduced into evidence 29 photographs taken by Ms. Proffitt over the course of three or four days depicting the extent of the victim's injuries.

Ms. Proffitt testified that this was "one of the wors[t] cases of bruising that [she had] seen in a" two-year-old child. Ms. Proffitt conceded that some of the bruising on the victim's hands and arms was darker in color and therefore older than the bruising on the victim's face. Ms. Proffitt recalled at least two occasions when she witnessed the victim being administered morphine for his pain, and she stated that, throughout her entire career, she had "never seen a child have so many bruises in so many different locations, and have them so severe to his head and neck."

Doctor Lesli Ann Taylor testified as an expert in the field of pediatric trauma. Doctor Taylor examined the victim when he arrived at the hospital on May 15, and she observed "bruising and swelling over his head, bruises on other aspects of his body, his buttocks, [and] his wrists." Having seen scores of fall-related injuries over the course of her 25-year career, Doctor Taylor was "suspicious from the very beginning"

that the victim's injuries were "not consistent with a fall from a porch." Doctor Taylor opined that the bruises on the victim's buttocks, arms, and hands were older than the bruises on his face and head, which she characterized as "severe." When he arrived at the hospital, the victim's eyes were swollen shut, and he was unable to open them for four or five days. Doctor Taylor testified that, in her opinion, the victim's injuries were the result of "inflicted trauma, non-accidental trauma."

WCSD Investigator Nikki Salyer was assigned to the victim's case on May 15, and she encountered the victim's mother, Ms. Percell, in the hospital emergency department. Ms. Percell was "pretty hysterical" when Investigator Salyer arrived, so officers moved Ms. Percell into a private waiting room where they interviewed her. Ms. Percell's statement to Investigator Salyer stated, in pertinent part, as follows:

> [The defendant] is a stay at home dad. . . . This morning, [the defendant] woke up and got the boys up, he took his mom, Angela Allen, to work at the VA, . . . . [The defendant] took [the baby] with him and [the victim] stayed with me. I'm sorry I didn't call immediately, that's when it started to swell and get bad. I'm not a bad momma, I swear. He didn't look that bad. I went in to check on [the victim] and that's when I called you all, [and] I started freaking out. I left the house this morning around 8:00 am to go to take my aunt . . . to the Salvation Army. I got back around 9:00. I let that happen to my son, how could I let that happen. [The defendant] left around 6:30 to take his mom and came back around 8:00. I was in the shower when he came back. The kids weren't up by then. They were both still there, and he woke them up after I left. When I got back around 9:30ish, [the defendant] took [the baby] and went to his mom, he told me [the victim] got hurt and to watch him. It was just getting worse and worse. I put ice on his head, and [A]quafor on his butt and on his ear where he hit that little piece of wood. I don't know that there was a fall. On Saturday, we were, me and [the defendant] were mowing. [The victim] was awake, we had the baby gate up and was checking on him every fifteen minutes or so. [The baby] was asleep and in his crib. [The victim] didn't fall that day. [The defendant] told me that [the victim] hurt himself but didn't tell me how. I am just thinking he fell off the porch and hit his head on the wood that I threw over near the porch Saturday. I don't know that's what happened because [the victim] [sic] didn't tell me what

- 4 -

happened he just left. He didn't look that bad until later. [The victim's] always been clumsy, but he never gets bruising from that. [The defendant] would never hurt him. I want [the victim] to be healthy. I swear I don't know what happened. Yesterday when I got home, [the victim] was o.k. I didn't see any bruises or anything wrong with him.

Investigator Salyer felt that Ms. Percell was not "being completely honest" with her because the statement "was very all over the place." Investigators then presented Ms. Percell with photographs taken of the victim's injuries and expressed their belief that the injuries were not caused by a fall. Ms. Percell then gave a second statement:

He has only whooped [the victim's] ass in front of me, not hard like it is showing in there. . . . I checked into Woodridge about two weekends ago, trying to get help and that I was paranoid. I thought . . . [the defendant] was telling me I was paranoid. I never thought [the victim] was being abused, if [the victim] had bruises on him [the defendant] would tell me [the victim] did it by playing with his toys. [The victim] never would tell me what happened. [The defendant] told me he took the spatula to [the victim] and whooped his butt and that he accidentally hit his head ([the victim's] head) and then [the victim] fell in his bedroom, today. That's the truth. I know that [the victim] did not have any of the injuries or bruises this weekend, I changed his diapers, it wasn't there, the bruises weren't there. I wasn't there on Monday through the day. [The defendant] put him in bed. Tuesday, Monday I'm not sure, I don't remember. I did not know it was that bad. I did not know he was hurting him. [The victim] did not look like that . . . yesterday. I don't remember him looking like that. That's the first time. On Sunday, [the victim] stayed with [the defendant] while [the baby] and I went to Wal-Mart. About two weeks ago is the last time [the victim] has been out of the house. I don't know what that man did to him, he will never see him again. I swear to you I didn't know. . . . When I got back, he said he got hurt and he fell. I said that because he was standing there when I was on 9-1-1. I was afraid he would take the phone. I told 9-1-1. I told them I was there when [the victim] fell off the porch, and to hurry. He wouldn't leave. I broke the spatula and threw it in

the trash. I called you all 30 min[utes] after I noticed it. It started getting worse. He told me he whooped him with a spatula. He said he got frustrated and it got out of hand. He didn't know why he did it he just got so angry. I called 9-1-1 twice. I was on the phone with 9-1-1 when he left with [the baby], he wanted to take [the victim] too, but I wouldn't let him cause I knew [the victim] needed a doctor. That's why I came. [The defendant] went to his mom's house. Before February [the victim] did not get bruises on his arms, and when it started I thought it was from him being rougher and from his potty. I also thought it was from him falling, his dresser, his toys. But I did notice they were different than before but I thought it was from him growing up.

WCSD Sergeant Sam Phillips interviewed the defendant on May 15. The defendant's statement to Sergeant Phillips provided, in pertinent part, as follows:

I'm a stay at home father. I provide primary care day to day. . . . Today around 8:00 a.m. give or take 15 min[utes] Amanda Percell, my girlfriend of around 2 years, Amanda was getting out of the shower, the back door of the living room was open and [the victim] was playing on the deck. I assumed he was inside till I heard a yell. We were both in the master bathroom. Amanda asked if I heard something. I said yeah and ran to the front of the house and outside. [The victim] was about 5 feet off the front of the deck, facing the road. I went down the steps to him. He was fussy and seemed a little beat up. I carried him in and comforted him. I gave him a bath to see if anything was going to stay open or what not like that. I took him out and dried him off. He seemed like he had a few nicks on him. Amanda was cuddling him. I got [the baby] ready and we went to my mom's. About 12:30 p.m., Amanda called me at my mom's on Amanda's cell phone. She was asking me what mom's address was and I told her I'd just come home to give my statement. Amanda worked yesterday from 6:30 a.m. to 3:00 p.m. She called in today because of [the victim]. [The baby] doesn't have discipline. With [the victim] we turn off his T.V., lock his toy trunk, and make him sit. When I spank him I use my hand and it's usually only one or two pops. . . . Including this morning over the last five days I've not noticed any bruising

on [the victim] while bathing him. I use a little car [loofah] to wash his entire body. [The victim's] been walking for a while. The last time he went to [the doctor] she stated he was developmental[ly] correct for his age.

Sergeant Phillips identified a number of photographs taken at the scene, including the stairs leading from the back deck. Sergeant Phillips testified that the deck was approximately five feet above the ground and that the grassy area at the foot of the stairs was undisturbed. Sergeant Phillips also located a spatula inside the residence next to a trash can; the spatula was "pretty well bent out of its usual shape" and appeared "like somebody ha[d] pressed on the bottom of it and bent it up."

Ms. Percell testified that the victim was born in July 2010 and that the defendant cared for both the victim and the baby while she was at work. With respect to May 15, Ms. Percell stated that she had left the residence at approximately 7:15 a.m. to take her aunt, Linda Bell, to work. Ms. Percell then returned to the residence to retrieve her work badge and discovered that one side of the victim's face was swollen and bruised. Ms. Percell wanted to call 9-1-1, but the defendant took the telephone from her and told her that she "had to lie," instructing her to tell the 9-1-1 operator that the victim "fell off the porch," although the defendant had already told Ms. Percell that he had "whooped [the victim] with a spatula" while Ms. Percell was gone. When Ms. Percell placed the call, the defendant stood nearby holding the baby. After the call was completed, the defendant left the residence with the baby and drove away. Ms. Percell then called 9-1-1 again. Recordings of both 9-1-1 calls were admitted into evidence and played for the jury.

Ms. Percell admitted that, in her initial statement to Investigator Salyer, she told the investigator "what he told me that happened." After viewing the photographs of the victim's injuries, she "couldn't take it" and provided a second statement, in which she told investigators that the defendant had "whooped [the victim] with a spatula" and had accidentally "slapped him across the face." Ms. Percell recalled giving the victim a kiss on his forehead on Tuesday night, May 14, while he was sleeping; she did not notice any bruising or swelling of his head at that time.

On cross-examination, Ms. Percell acknowledged that she had also been charged with aggravated child abuse and aggravated child neglect in connection with the victim's injuries. Ms. Percell also admitted that she broke the spatula and threw it away, but she categorically denied abusing the victim.

Former WCSD Investigator Jared Taylor testified that, as the lead investigator in the case, he had interviewed the defendant on the evening of May 15. A

video recording of the defendant's interview was admitted into evidence and played for the jury.

During the interview, the defendant stated that he stayed "at home 24 hours a day" with the children, which caused him to get "a little bit on edge." The defendant admitted that he would spank the victim as a form of discipline. He denied using any sort of instrument, stating that he would pull down the victim's pants and "pop him once or twice on the butt" with his bare hand. The defendant denied spanking the victim on the morning of May 15 but admitted that he had spanked the victim "the day before yesterday" for flushing objects down the toilet. The defendant also stated that, because the victim was still in the process of toilet-training, it was "really hard." The defendant claimed that he heard the victim yelling at approximately 8:00 a.m. and discovered the victim in the yard "squealing." The defendant examined the victim and noticed a few small scratches and bumps on his head and a few "spots" on his arms and legs. The defendant did not notice any other older bruises on the victim's body.

Believing the victim to be alright, the defendant left around 8:30 and drove to his mother's house, staying there until Ms. Percell contacted him to report that the victim's head was swollen. The defendant admitted that he was the primary disciplinarian of the family, but he estimated that Ms. Percell had most recently spanked the victim "over the weekend." The defendant stated that he and Ms. Percell were the only people who cared for the children. The defendant denied inflicting any of the injuries on the victim and, when confronted with photographs of the extensive, older bruising on the victim's body, denied having seen any of those bruises when he bathed the child shortly after the alleged fall occurred. The defendant surmised that Ms. Percell must have inflicted the injuries.

Linda Bell, Ms. Percell's aunt, testified that Ms. Percell drove her to work on the morning of May 15. She stated that Ms. Percell picked her up at 8:15 a.m. and dropped her off at work at approximately 8:45 a.m.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal, the defendant elected to testify and to present proof.

Angela Allen, the defendant's mother, testified that someone drove her to work on the morning of May 15, although she could not recall whether the defendant had been her driver. After Ms. Allen arrived at work, the defendant called her before 9:00 a.m. and asked "what to do for swelling." The defendant did not elaborate, and Ms. Allen "didn't think twice about it."

The defendant testified that he drove Ms. Allen to work on the morning of May 15 and arrived home at approximately 8:00 a.m. Ms. Percell was taking a shower, and both children were asleep. The defendant then changed clothes and began "playing a [video] game." Ms. Percell had just finished showering and dressing when the defendant "heard something." The couple stepped outside and discovered the victim at the bottom of the steps. The defendant continued:

> I went and I picked him up and he seemed a little scuffed up. I took him and took his clothes off just to make sure I could see his whole body just to check him. I put him in the tub so I can clean him up and when I got him out he seemed okay.

The defendant "assumed that [the victim] stumbled and . . . fell." The defendant described the victim's injuries as slight, stating that he was concerned about "an abrasion . . . right between his eyes, . . . and I wanted to make sure I got that clean" because his mother had taught him that "if anything is open you need to wash it out and try to make sure it doesn't get infected." The defendant contacted Ms. Allen "probably between 8:00 and 9:00" to inquire about swelling and "what to do in case it would happen and . . . how to treat it."

The defendant denied hitting the victim or otherwise causing his injuries, and he denied telling Ms. Percell that he had done so. The defendant testified that he was unaware that Ms. Percell had left the residence that morning to take Ms. Bell to work. Before the defendant left the house on the morning of May 15, he was unaware that the victim was in need of any aid. The defendant decided to leave the house to give Ms. Percell "her space and let her be alone." Because Ms. Percell would not allow the defendant to leave with the victim, the defendant took the baby and drove to his mother's house.

An hour or two later, Ms. Percell called the defendant to report that the victim's head had swollen and that "someone needed to question" the defendant. The defendant had no explanation for the cause of the victim's injuries, which he admitted were "[h]orrible," and he denied ever noticing any of the contusions on the victim's body. The defendant confirmed that he and Ms. Percell were the only adults at their residence on the morning of May 15.

Based on this evidence, the jury convicted the defendant as charged of two alternative counts of aggravated child abuse and two alternative counts of aggravated child neglect. Following a sentencing hearing, the trial court merged the alternative counts into one conviction of aggravated child abuse and one conviction of aggravated child neglect. The court imposed a sentence of 18 years' incarceration for the conviction

of aggravated child abuse, to be served at 100 percent by operation of law, and a term of 18 years' incarceration for the aggravated child neglect conviction, to be served concurrently to the aggravated child abuse conviction for an effective sentence of 18 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends only that the evidence is insufficient to support his convictions. Specifically, the defendant argues that the convictions were based solely on the uncorroborated accomplice testimony of Ms. Percell.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative

evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

"A person commits the offense of aggravated child abuse, [or] aggravated child neglect . . ., who commits" child abuse or child neglect, as those terms are defined, and "[t]he act of abuse, [or] neglect . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). "Child abuse" is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). "Child neglect" is defined as "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." *Id.* § 39-15-401(b). "'Serious bodily injury to the child' includes, but is not limited to, . . . injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." *Id.* § 39-15-402(d). When the victim of either aggravated child abuse or aggravated child neglect is eight years of age or less, the offenses are elevated to Class A felonies. *Id.* § 39-15-402(b).

In the instant case, the proof at trial established that the victim sustained severe injuries to his head and face, causing his face to swell so significantly that he was unable to open his eyes for several days. Indeed, the photographs depicting the injuries to the victim's face were nothing short of horrific. Ms. Proffitt testified that the victim's was "one of the wors[t] cases of bruising" that she had ever seen in a two-year-old child, and Doctor Taylor characterized the bruising on the victim's head and face as "severe." Ms. Proffitt also testified to "patterned injuries" on the victim's body, which she defined as "an impression of an item that was used." Doctor Taylor opined that the victim's injuries were "not consistent with a fall from a porch" and were caused by "inflicted . . . non-accidental trauma."

Although Ms. Percell initially told investigators that the victim had fallen from the porch, she changed her statement after viewing photographs of the extent of her son's injuries. According to Ms. Percell, she had witnessed the defendant "whoop" the victim's buttocks on a prior occasion, and the defendant had told her that the bruises she had seen on her son were the result of the victim's "playing with his toys." On the

evening of May 14, Ms. Percell arrived home from work after the victim had gone to sleep. She kissed his forehead and saw no bruising or swelling at that time. The following morning, she left home at approximately 7:15 to drive Ms. Bell to work – which was corroborated by Ms. Bell – and Ms. Percell returned to the residence around 9:00 a.m. At that time, she saw the victim's bruised and swollen face. The defendant told Ms. Percell that he had "whooped [the victim] with a spatula" and "accidentally" hit the victim's head, telling her that "he got frustrated and it got out of hand" and "[h]e didn't know why he did it[,] he just got so angry." Ms. Percell attempted to call 9-1-1 but the defendant took the telephone from her and instructed her to lie and say that the victim had fallen. Ms. Percell cooperated because the defendant was standing over her holding their baby while she made the call. The defendant then left the scene.

Sergeant Phillips testified that he located a bent spatula by the trash can in the residence, and Ms. Percell admitted that she had thrown it away. The defendant's mother, Ms. Allen, testified that the defendant had contacted her before 9:00 a.m. to inquire how to treat "swelling." The defendant himself admitted that he was the primary disciplinarian of the family; that he spanked the victim as a form of discipline, as recently as May 13; and that his role as a stay-at-home father caused him to get "a little bit on edge."

The defendant, for his part, denied inflicting any of the victim's injuries and claimed that, after bathing the victim immediately following the victim's alleged fall on May 15, he noticed no bruising on the victim's body aside from an abrasion between the victim's eyes. It was the jury's province to determine which parts of the defendant's testimony to credit, inasmuch as there is no requirement that a jury must wholly accept or reject a witness's account of events. *See State v. Bolin*, 922 S.W.2d 870, 876 (Tenn. 1996); *State v. Adams*, 45 S.W.3d 46, 56 (Tenn. Crim. App. 2000), *perm. app. denied* (Tenn. 2001); *State v. Gilbert*, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980) ("The jury was entitled to accept that part of the defendant's proof they felt was consistent with truth and reject that portion they believed originated in falsity."). The overwhelming evidence of significant, older bruising on the victim's body and the extent of the severe injuries to the victim's head and face belie the defendant's contention that he saw no bruising or major injury to the child when he allegedly bathed him on the morning of May 15.

Taking all of this evidence into consideration, we hold the evidence supports the defendant's convictions of aggravated child abuse and aggravated child neglect. In his own video-recorded statement, the defendant admitted disciplining and spanking the child and inexplicably denied noticing the extent of the child's injuries less than two hours before emergency services arrived. In addition, the defendant admitted that he contacted his mother prior to 9:00 a.m. on May 15 to inquire about treatment for swelling. The combined testimony of Ms. Bell and Ms. Allen illustrate that the defendant

called Ms. Allen about "swelling" during the time that the defendant was home alone with the victim.  This evidence corroborates the testimony of Ms. Percell and "connect[s] the defendant with the commission of the crime[s] charged." *See Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803).  Viewing this evidence in the light most favorable to the prosecution, we find the evidence adduced at trial sufficiently established the defendant's convictions of aggravated child abuse and aggravated child neglect.

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE